UNITED STATES of America, Appellee,

v.

Pablo GUERRA and Manuel Rivera, Appellants.

No. 440, Docket 27792.

United States Court of Appeals Second Circuit.

Argued April 23, 1964.

Decided June 5, 1964.

John W. Mills, Asst. U. S. Atty. for Southern District of New York, New York City (Robert M. Morgenthau, U. S. Atty., and Neal J. Hurwitz, Asst. U. S. Atty., of counsel), for appellee.

Jerome J. Londin, New York City, for appellant Guerra.

Leon B. Polsky, New York City (Anthony F. Marra, New York City, on the brief), for appellant Rivera.

Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge:

After a trial to the Court without a jury, appellants Pablo Guerra and Manuel Rivera were convicted of unlawfully selling narcotics, and of participating in a conspiracy to do so; in addition, Guerra was convicted of assaulting a narcotics

agent with a deadly weapon. On appeal, no challenge is made to the sufficiency of the evidence supporting the convictions, but appellants raise several arguments relating to the fairness of the trial, and the propriety of several of the Court's rulings therein.

Since the sufficiency of the evidence is conceded, the government's proof may be briefly summarized. Thus, prosecution testimony at trial revealed that on the evening of January 26, 1962, federal narcotics agent James Ceburre was introduced to appellant Rivera in a hallway at 40 West 89th Street in Manhattan by Alcides Lugo, then a "special employee" of the narcotics bureau. At approximately 8:30 P.M., Rivera directed Ceburre and Lugo to a rear first-floor apartment; there, Rivera handed Ceburre a small glassine envelope containing a white powder, informed him that "this is a sample of cocaine," and indicated that the "Cuban woman is expected momentarily." Rivera then left the apartment, returned to say that he was "waiting for her and expect her," left again, and finally returned at approximately 9:00 P.M. with "the Cuban woman," co-defendant Estella Prat.[1]

As revealed by the agent at trial, a brief conversation between Prat and Ceburre ensued, the most significant portions of which strongly indicated that "the Cuban woman" was not acting on her own behalf. Thus, after Ceburre had stated that the "sample" was acceptable and Prat had offered to supply as much cocaine as he desired at a price of $14,000 per kilogram, the agent flatly refused to pay more than $12,000 per kilo. In response, Prat did not attempt to negotiate the terms of sale, but merely stated that she would have to contact "her man" about the reduced price, and thereupon left with Rivera. Through the testimony of agents maintaining surveillance outside the 89th Street address, it was established that Prat entered a street telephone booth, and placed a call immediately upon leaving the building.

At approximately 9:15 P.M., Prat returned to the apartment, followed shortly thereafter by Rivera. In Rivera's presence, Prat told the waiting Ceburre that she had spoken to her "source of supply," and that she was able to deliver five kilograms of cocaine at a compromise price of $12,500 per kilo. When Ceburre agreed to these terms, arrangements were made for delivery of the five kilos between 2:00 and 3:00 P.M. on the following afternoon, at 58 West 89th Street. All of the parties then left the apartment, and the "sample" initially given to Ceburre by Rivera was subsequently tested, and found to contain .99 grams of white powder which was analyzed as 62.6% cocaine.

At 1:30 on the afternoon of January 27, 1962, Ceburre and Lugo arrived at 58 West 89th Street, and entered the building through the basement. As revealed by Ceburre's trial testimony, Rivera met them there, handed Lugo a set of keys, and told them to proceed to apartment 11. Although Rivera told Ceburre that Prat planned to deliver the cocaine at 2:15 that afternoon, it was not until 3:20 that Prat arrived with appellant Guerra, and the two were ushered into apartment 11 by the waiting Rivera.

After a three-cornered conversation among Prat, Guerra and Lugo, unintelligible to Ceburre since it was conducted in Spanish, Prat informed the agent that they had only brought one kilogram of cocaine because it was "too dangerous" to carry five at one time. Guerra then asked Ceburre whether he had brought the money, and Ceburre replied that it was in the trunk of Lugo's car, parked outside the building. In response, Ceburre asked Guerra whether *he* had the cocaine, whereupon Guerra partially unzipped the jacket he was wearing and extracted two plastic bags containing a white powder which he placed on a bed

1. Although convicted of selling narcotics and participating in the conspiracy, Prat has not appealed.

in the apartment. Ceburre then left to get the money.

Once outside the building, Ceburre took an attache bag from the trunk of Lugo's car and spoke briefly with one of the agents maintaining surveillance. After having been readmitted to the building through the basement entrance by Rivera, Ceburre proceeded to apartment 11, and Guerra opened the door. And at this point, the testimony indicates that pandemonium broke loose.

Narcotics Agent Manley, who had raced up the stairs with Agent Rahas while Ceburre was re-entering the building, flashed his badge to Guerra and shouted, "Hold it, Federal Narcotics Agents. You are under arrest." When Guerra tried to slam the door, Rahas pushed it open, announced that he too was a federal agent, and that all those present were under arrest. At trial, Rahas described the ensuing events: "After I entered the door, the defendant Guerra came out from an alcove or a kitchen that was on my right-hand side and pushed me aside and attempted to escape into the hallway. I struck him with my revolver on the back of the head or the neck, and that sent him across the hall and into the door on the other side of the hallway. As he was stumbling towards the other side of the hallway, I was right behind him. As he hit the doorway on the other side of the hall, he turned, and he produced a pistol from his belt. I grabbed the pistol, called out to the other agents that he had a gun. I held the pistol with my left hand and proceeded to subdue him * * *."

The contents of the two plastic bags which Guerra had placed on the bed were later examined, and found to contain 909.5 grams of powder, tested as 45.6% cocaine.[2]

### I. *Guerra*

Guerra raises three principal arguments on appeal, all of which we find without merit. Thus, there seems little to his contention that the prosecution failed to make timely production of certain reports prepared by government agents. The record reveals in this regard that in the presentation of the government's direct case at trial, Narcotics Agents Ceburre and Rahas were followed to the stand by Agents Krueger, Avant and Holborow, in that order. At the conclusion of Ceburre's direct testimony, Guerra's counsel made no request for the production of any material under the Jencks Act, 18 U.S.C. § 3500, but Prat's attorney inquired as to whether Ceburre had prepared any reports of his activities in connection with the case. When Ceburre replied that he had, his report was furnished to the defense, and no further requests were made for any other material under § 3500 while Ceburre's cross-examination proceeded.

Similarly, after Rahas' direct testimony was completed, Guerra's counsel requested production of the report that Rahas had prepared, and the document was promptly produced. During the course of Rahas' cross-examination, however, Prat's attorney asked whether the activities of Rahas were made the subject of reports prepared by any other government agents, and requested that such reports be immediately produced. Finding that the defense was entitled to reports of this nature only when the agent who had prepared them was testifying, the Court denied the request at this time.

Although Guerra's attorney had made no Jencks requests when Ceburre had testified, and requested only Rahas' report when that agent was on the stand, Guerra now complains that a report pre-

---

2. Although indicted for the sale of both the "sample" on January 26, and of the kilogram delivered on the following day, appellant Rivera was convicted only of participating in the former transaction, and the latter charge was dismissed as against him. Appellant Guerra was not named in the indictment as participating in the sale of the "sample"; both the narcotics and assault counts on which he was convicted related to the events of January 27.

pared by Agent Krueger should have been produced for the cross-examination of Ceburre and Rahas, and that reports of Agents Rahas, Manley, Avant and Holborow should also have been furnished at the conclusion of Ceburre's direct testimony. Guerra contends, in this regard, that statements made by Ceburre and Rahas were incorporated into the reports of the agents who subsequently testified, and that production of these reports at a time when Ceburre and Rahas remained on the stand was essential to an effective cross-examination of those agents.

▮ Under the circumstances of the present case, Guerra's objections have a hollow ring. Virtually all of the reports in question were, in fact, provided to the defense when the agents who had prepared them—Rahas, Krueger, Manley, Avant and Holborow—completed their direct testimony. As was true with respect to a similar contention in United States v. Romano, 330 F.2d 566 (2d Cir. 1964), the defense was perfectly free to recall Ceburre and Rahas if the Jencks material subsequently produced in connection with the examination of other witnesses would have materially aided in the cross-examination of these two agents. Having made the tactical decision not to do so, Guerra cannot now complain that what he characterizes as a delay in production worked to his disadvantage. In any event, moreover, there was, in fact, no delay in production. Thus § 3500 specifically provides that "no * * * report * * * made by a Government witness * * * shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." Here, virtually all of the reports *were* furnished at the stipulated time, and there was accordingly no error. And, since we find, after careful examination of those few reports which were not furnished to the defense, that they did not relate to the subject of the reporting agents' direct testimony, it was not error under the Act to refuse to produce them.

▮ Guerra's assertion that a fair trial was precluded by the non-appearance of "special employee" Lugo is equally without merit, in light of the repeated and diligent efforts of the Court and prosecution to secure Lugo's attendance at the trial. Thus, the record reveals that Agent Ceburre was recalled to the stand for the express purpose of explaining the government's attempts to locate the informer; it also appears that several federal agents had expended more than 100 hours in an effort to find him. Not only did both prosecution and defense issue subpoenas to compel Lugo's appearance, but a week's adjournment of the trial was granted so that the informer might be located. Under these circumstances, the decision to proceed in his absence was hardly an abuse of discretion. See Rovario v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States v. Cimino, 321 F.2d 509 (2d Cir. 1963); United States v. Holiday, 319 F.2d 775 (2d Cir. 1963). Compare United States v. White, 324 F.2d 814 (2d Cir. 1963).

Even in White, where we reversed a narcotics conviction because an adjournment was not granted for the few weeks time necessary to obtain the informer's appearance, we emphasized that the "government is not the guarantor of a special employee's appearance at trial." Indeed, in remanding that case, we were careful to explain that our "opinion does not mean that on a new trial the Government is under any duty to produce [the informer] or that the trial may not proceed without [him] if he should be unavailable." Here, unlike White, the government *did* make every effort to locate the missing witness, an adjournment *was* granted, and there was no indication that Lugo would *ever* be available. We cannot find that the decision to proceed to trial under these circumstances was reversible error.

▮ Finally, Guerra somewhat belatedly challenges the competence of the interpreter who translated his testimony at trial. His contentions in this regard are raised for the first time on appeal,

and, indeed, at the outset of the trial, Guerra's counsel fully conceded the interpreter's qualifications. In any event, after examining the record, we do not find that Guerra's complaints on this score have been established. Thus, the "errors" in translation cited by the appellant uniformly appear of minimal significance. We are not willing to say, for example, that the interpreter's occasional transposition of Guerra's remarks from the first to the third person precluded the possibility of a fair trial.

Since we thus find Guerra's contentions to be without merit, his conviction is affirmed.

## II. *Rivera*

■ Anticipating the Supreme Court's recent decision in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), Rivera's principal contention on appeal is that the government unlawfully interrogated him after his indictment and before counsel had been appointed. Asserting that the statement thus obtained was "used" at trial, Rivera strenuously insists that such "use" requires that we reverse his conviction on the ground that it was obtained in violation of his Sixth Amendment right to counsel.[3]

Rivera, like his co-defendants, was first arrested on January 27, 1962. All that appears from the record in this connection is that he was fingerprinted and detained for three hours at that time, but then released and permitted to return to his home. The precise circumstances of his post-indictment questioning are equally unclear. On February 5, Rivera was indicted, and on the same day, a bench warrant was issued, directing "any United States Marshal or other authorized officer" to arrest the defendant, and "bring him forthwith before the United States District Court for the Southern District of New York" to answer to the indictment.

Pursuant to the warrant, Rivera was arrested at his home at 9:00 on the morning of February 9. Prior to being brought before the Court where counsel was appointed, however, he was apparently taken to the office of an Assistant United States Attorney, where he was questioned. The record provides no indication whatsoever as to the nature,

---

3. Rivera also contends that the District Court erred in permitting the prosecution, while cross-examining co-defendant Prat, to use a statement obtained from that defendant in the absence of counsel. As has been indicated, Prat was arrested on Saturday afternoon, January 27; at that time, or so the government contends, a United States Commissioner was not available for arraignment. On the following Monday, or January 29, Prat was interviewed by an Assistant United States Attorney for approximately forty-five minutes immediately prior to her arraignment before the Commissioner. Her statement, which contained no admissions of guilt, was not admitted into evidence, but was used for purposes of cross-examination when she took the stand in her own behalf at trial. Since the interrogation of Prat took place well before her indictment on February 5, there has been no contention that the use of the statement was unconstitutional, but we are asked to hold that it was obtained during an impermissible period of delay before arraignment within the meaning of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.

Ed.2d 1479 (1957). We find it unnecessary to consider the merits of these contentions. For even if the questioning to which Prat was subjected may be found to have been improper, we find it clear that Rivera lacks standing to complain that a statement was illegally taken from a co-defendant and employed to cross-examine that co-defendant. Cf. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As will be noted, *infra*, the Supreme Court in Massiah was explicit on this very point, even under circumstances where the statement was obtained in violation of the Constitution. Thus, in concluding the Massiah opinion, the Court emphasized that "[a]ll that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used *by the prosecution as evidence against him* at his trial." (Emphasis in original.) Where, as here, the interrogation was *before* indictment, and no constitutional issued is raised, Rivera's argument is all the weaker.

duration, or extent of this interrogation; we know only that Rivera signed no confession or statement, and that he was brought before the District Court at approximately 2:45 P.M., that afternoon. For present purposes, it is sufficient to note that aside from his objection to the bare fact of questioning, Rivera makes no claim that he was unfairly treated at this time, and there is no assertion that any form of coercion—whether explicit or implied, physical or psychological—was employed.

At the trial, the government's direct case was completed without any reference to this post-indictment interrogation, or to any statement that Rivera may have made at the time. On Rivera's cross-examination, however, the Assistant United States Attorney briefly brought up the subject. Thus, Rivera had testified on his direct examination at the trial that his co-defendant Prat was looking for an apartment on January 26, 1962, and that he had "seen" her on one earlier occasion, in the company of his friend Gonzales. On cross-examination, the prosecutor asked Rivera whether he recalled having been asked the following question and having given the following answer in the office of the Assistant United States Attorney prior to his arraignment on the indictment:

"Q. Do you know a person by the name of Estella Prat?

"A. That woman came to rent the apartment. I don't know her before."

We assume that this one isolated question in a 900-page trial record was posed in an attempt to show a prior inconsistent statement; but this attempt fell wide of the mark. The prosecutor probably believed—erroneously as will soon appear—that there was a conflict between Rivera's prior statement that he didn't "know" Prat before January 26, and his trial testimony that he had "seen" her once before. But whatever "conflict" may have appeared on the surface was promptly dissipated. Thus, immediately after Rivera acknowledged making the prior statement, the following colloquy ensued at the trial between the prosecutor and the defendant:

"Q. So you told me that you met when she came to rent the apartment.

"A. Yes, but you told me the name. But before I don't know the name.

"Q. You knew her before that time, but you didn't know her name?

"A. No. I knew her from with Gonzales, with Gonzales."

At this point, the matter was abruptly discontinued, and the subject of Rivera's interrogation was never again broached, either on his cross or redirect examinations, nor was it referred to in the summations of either prosecution or defense. It was clear, therefore, that Rivera's allegedly "inconsistent" answers had precisely the effect of showing consistency.

■ We are willing to agree with Rivera that the questioning to which he was subjected prior to arraignment on the indictment should not have taken place. While the Massiah case is factually distinguishable, the language employed for the Court by Mr. Justice Stewart would certainly suggest that any form of post-indictment interrogation when a defendant is not assisted by an attorney unlawfully abridges the right to counsel guaranteed by the Sixth Amendment. Thus, the Supreme Court in Massiah seemed wholehearted in its approval of the "constitutional rule" which had been "unequivocally followed" by the New York State courts, and was expressed by the New York Court of Appeals in People v. Waterman, 9 N.Y. 2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1961): "Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." See also People v. Meyer, 11 N.Y.2d 162, 227 N. Y.S.2d 427, 182 N.E.2d 103 (1962); Peo-

ple v. DiBiasi, 7 N.Y.2d 544, 200 N.Y.S. 2d 21, 166 N.E.2d 825 (1960).

But if we thus agree that the prosecutor acted unlawfully in attempting to interrogate Rivera after his indictment and in the absence of counsel, it by no means follows that his conviction was necessarily vitiated. For considered against the background of this case, we do not believe that one innocuous question and answer, introduced in an abortive attempt to impeach Rivera on a minor issue, cf. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), constitutes an incriminating "use" of the prior statement so as to require reversal. In short, the fact that Rivera may have been unlawfully questioned does not of itself mean that all subsequent proceedings were tainted with that illegality. Indeed, the Supreme Court's order in the Massiah case specifically provided that the case was to be "remanded to the United States District Court for the Southern District of New York for further proceedings in conformity with the opinion" of the Court. It seems noteworthy that the Court did *not* direct a dismissal of the indictment. Similarly, in the present case, is would seem senseless to hold that the government's error, even if contributing in no manner whatsoever to Rivera's conviction, precluded any possibility of bringing him to justice. If, for example, the questioning had not even been mentioned at trial and had not provided the prosecution with any clues or leads, it would have been clear that there was no relationship between the interrogation and the conviction, or the fairness of the trial itself. Under such circumstances, there is no doubt, and Rivera has conceded, that his conviction would have to be affirmed. See Headen v. United States, 317 F.2d 145 (D.C.Cir. 1963).

In this regard, the Supreme Court was careful in Massiah to emphasize that the "use" to which the prior statement is put, must be determinative. Thus, in response to the government's argument that investigation in criminal cases can-

not practicably terminate with indictment, the Court conceded that "in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." As we read this portion of the opinion, it was the *use* of Massiah's *incriminating* statements, and the correlative prejudice to the defendant, which required reversal of the conviction thus obtained; the fact that Massiah had once been unlawfully questioned did not itself mean that he could never be subsequently tried. As we have already demonstrated, in the present case, the statement obtained was *not* incriminating and the innocent use to which it was put at trial was either equivalent to no use at all or actually benefited the defendant; under these circumstances, reversal seems wholly unwarranted.

In United States v. Kane, 322 F.2d 787 (2d Cir. 1963), we were faced with a factual situation strikingly similar to that presented here. There, in a trial before the Court without a jury, a government agent was permitted to testify as to statements made by the defendant in an interview with an Assistant United States Attorney, nine days after the defendant's appearance before a United States Commissioner for the fixing of bail, and eleven days before his arraignment on the indictment when counsel was appointed. Finding that the statements thus admitted were wholly exculpatory and corroborative of similar evidence already before the Court, we concluded that no prejudicial error had been committed, and affirmed the conviction in a brief, *per curiam* opinion.

Since the possibility of prejudice to the defendant is equally as remote in the present case as it was in Kane, there is no reason why we should reach any dif-

ferent result here.[4] But lest there be any doubt concerning our interpretation of Massiah, a further word seems in order. At least from the time of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), American courts have recognized that a society which denies the assistance of counsel to a defendant at a crucial stage in a criminal proceeding cannot be assured that fair and impartial justice—the indispensable objective of any judicial system—has truly been achieved. Although the road has not been without its detours, the Supreme Court's decisions in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and now in Massiah have gone far to redress the balance between an often impoverished and generally untutored defendant and the seemingly all-powerful state, with its battery of trained attorneys and its complement of experienced investigators. But if, at times, society's interest in bringing the guilty to justice has necessarily been subordinated to its concern for protecting the innocent or maintaining the integrity of is police, prosecutorial and judicial machinery, that interest has never been —and in a civilized society can never be —entirely forgotten. The day has certainly not come when courts will set a convicted criminal free for no reason other than that some practice of police or prosecution—wholly unrelated to the conviction itself—did not meet with their approval. If that unhappy day should ever arrive, the often-heard criticism that law and lawyers are interested only in "technicalities" will have a ring of truth, and courts may rightfully be accused of exalting form above substance.

We cannot believe that the Courts which decided Powell and Gideon and Massiah, decisions which touched at the core of our adversary system, were con-

4. Although Rivera contends that our recent decision in United States v. Plattner, 330 F.2d 271 (2d Cir. 1964), renders the presence or absence of prejudice irrelevant, we do not interpret the Plattner opinion as so holding. In Plattner, where prejudice was found, we upheld the constitutional right of a criminal defendant to conduct and manage his own case *pro se*, if he so desired. In such a case, just as where counsel has been *denied* at trial, an insistence that a defendant establish the extent of prejudice which he has suffered would obviously be futile; it is patently impossible to divine the precise steps which a defendant acting *pro se*, or, conversely, a trained attorney, *might* have taken had he been given the opportunity. Where a constitutional right has been abridged in such cases, we will accordingly not stop to speculate as to the prejudice which might have resulted. Compare United States ex rel. Durocher v. LaVallee, 330 F.2d 303 (2d Cir. 1964). In the present case, on the other hand, there is no reason similarly to *assume* that prejudice accompanied the constitutional violation. We *know* precisely what did happen as a result of the illegal questioning; one question and answer were called to the Judge's attention and these served only to buttress the defendant's trial testimony. Under such circumstances, we do not feel compelled to close our eyes to reality; since we *know* that the defendant was not prejudiced, there is no justification for overturning his conviction.

We are reinforced in our conclusion by the opinion of Mr. Justice Harlan for four members of the Supreme Court in Fahy v. Connecticut, 375 U.S. 85, 92, 84 S. Ct. 229, 11 L.Ed.2d 171 (1963). There, the Court was confronted with the contention that the admission of evidence, illegally seized under Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), constituted harmless error. Since a majority of five Justices concluded that the particular evidence admitted in that case *had* been prejudicial, they did not reach the question whether the harmless-error rule was inapplicable to evidence obtained in violation of the Constitution. But Justices Clark, Harlan, Stewart and White disagreed. Finding that the evidence had not been prejudicial, they went on to emphasize the vitality of the harmless-error rule, even in *situations* in which the Constitution had been violated. In Mr. Justice Harlan's words, "[t]he question of harmless error turns not on the reasons for inadmissibility but on the effect of the evidence in the context of a particular case." We can perceive of no reason, and appellant has offered none, why the fruits of illegal questioning should be treated any differently in this respect from the fruits of an unlawful search.

cerned only with technicalities of form or legal niceties. The opinions in those cases, rather, reflected an intense belief that the rules which they established were vital if the fundamental rights safeguarded by our Constitution were to become a living reality. They were designed to ensure that a defendant unequipped or not permitted to engage counsel would not suffer for that reason; they were not intended merely to provide a defendant such as Rivera, whose interrogation without counsel contributed in no way to his conviction, with a technical means to vitiate a fair trial. If we were mechanically to invoke Massiah to reverse this conviction, we would transform a meaningful expression of concern for the rights of the individual into a meaningless mechanism for the obstruction of justice. We cannot, and will not, so act. The judgment of conviction is affirmed.