**UNITED STATES of America,
Appellee,**

v.

**Anthony BARATTA, Samuel Monastersky, and Rocco Sancinella,
Appellants.**

**No. 289, Docket 31744.**

United States Court of Appeals
Second Circuit.

Argued Feb. 21, 1968.

Decided June 21, 1968.

Certiorari Denied Nov. 12, 1968.
See 89 S.Ct. 293.

Abraham D. Sofaer, Asst. U. S. Atty., (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, David M. Dorsen, Asst. U. S. Atty., of counsel), for appellee.

Abraham Glasser, New York City (Herman Edelman, New York City, of counsel), for appellant Anthony Baratta.

Theodore Krieger, New York City, for appellant Rocco Sancinella.

Albert J. Krieger, New York City, for appellant Samuel Monastersky.

Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*

GIGNOUX, District Judge:

Appellants Anthony Baratta, Samuel Monastersky and Rocco Sancinella here appeal their convictions of violations of 21 U.S.C. §§ 173, 174 (1964) relating to the unlawful importation and distribution of narcotics.[1] The indictment was in two counts. The first count charged each appellant with conspiracy to violate the above-mentioned statutes, such a conspiracy being specifically made illegal by section 174. The second count alleged that each appellant was guilty of a substantive violation of these sections as well.[2] All three appellants were convicted on both counts after a four day jury trial. Baratta was sentenced to five years imprisonment on the conspiracy count and ten years on the substantive count, to run consecutively. Monastersky was given concurrent ten year sentences on each count. Sancinella received consecutive sentences of five and eight years on the conspiracy and substantive counts respectively. Their appeal presents three issues which merit discussion: (1) Baratta's claim that the Government improperly used against him at trial a statement obtained from him in violation of the *Miranda* doctrine and objects illegally seized at the time of his arrest; (2) the contention of Monastersky and Sancinella that there was in-

---

* Of the District of Maine, sitting by designation.

1. 21 U.S.C. § 173 prohibits, except under certain very limited circumstances, the importation of narcotic drugs into the United States. 21 U.S.C. § 174 provides:

 Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than

 $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

 Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

2. These appellants were indicted together with one Anthony Verzino and one America Vega. Verzino pleaded guilty before trial and Vega, who had been indicted on the conspiracy count only, was convicted on that count but is not involved in this appeal.

sufficient evidence of their knowledge of illegal importation of the narcotics to sustain the jury's verdict; (3) Baratta's contention that various errors in the trial court's charge, either individually or cumulatively, deprived him of a fair trial. Upon a consideration of the entire record, we feel that there was adequate evidentiary support for the verdict and that no prejudicial error has been committed. We therefore affirm the convictions of all appellants.

The Government's evidence, consisting mainly of the testimony of federal and local narcotics agents, tended to establish the following sequence of events.

On July 15, 1963, at about 11:15 p. m., George Bermudez, a New York City Police undercover narcotics agent, entered the Sonnet Lounge on the East Side of Manhattan. About one hour later he was joined there by one Ralph "Rufus" Ciccone, who informed him, "My man is here. Did you see him?" Upon Bermudez' negative reply, Ciccone brought over to him the appellant Samuel Monastersky, who had been seated in the bar when Bermudez had arrived. Ciccone introduced the two and asked Monastersky to assure Bermudez, who was posing as a purchaser of narcotics, that "everything is okay." Monastersky replied, "It's like Rufus said, everything will be okay; as far as the three ounces that he owes you, you will get it." Bermudez asked when he would get the promised three ounces, and Monastersky stated, "As soon as my man comes back from out of town." After Monastersky had left the bar, Ciccone informed Bermudez that Monastersky was "the big man" and that the person who was out of town was one "Tony Vase," afterwards identified as Anthony Verzino.

On July 18, 1963, at about 11:00 p. m., Bermudez met Ciccone and Monastersky at the 292 Club at 292 East 149th Street in the Bronx, where he was assured by them that he would get the three ounces and was instructed by Monastersky to return at the same time the following evening. At about 11:00 p. m.

the following evening Bermudez found Monastersky and Ciccone at the 292 Club and asked Ciccone "Am I gonna get it?" Monastersky answered, "Wait a while, Tony will be here in a little while. We'll know a little bit better when he gets here." At about 1:00 a. m. Anthony Verzino entered the bar and was introduced to Bermudez by Monastersky. He stated that he understood that Bermudez had received bad goods from Ciccone, and announced that at the request of Monastersky he was offering to help Ciccone out. The price for a quarter kilogram of heroin was set at $3400 instead of Verzino's normal price of $4300 to make up for some of the money that Bermudez had lost in his dealings with Ciccone. Delivery was to be arranged through Ciccone.

On July 29, 1963 Bermudez encountered Verzino at the Vertigo Bar on Second Avenue and asked him about the deal that they had arranged. Verzino replied that Bermudez had not yet been "checked out" and that they would be meeting in the future.

On September 21, 1963, at about 2:00 a. m., Bermudez telephoned the 292 Club and spoke to Monastersky, who invited him over. Arriving at the club a short time later, Bermudez explained to Monastersky that he had been in Florida for some time and that he had heard that Ciccone was dead. Monastersky asked if Bermudez was still interested in the deal, and upon Bermudez' affirmative reply, stated that he had "some very good top goods right now." Bermudez asked about the price of a quarter kilogram. Monastersky then called over appellant Rocco Sancinella, who informed Bermudez that the price would be $4000. Bermudez demurred, reminding Monastersky that this was not what they had spoken about. Sancinella then walked over to Verzino, who was also in the bar. A moment thereafter the latter motioned Bermudez over to him and told him that the lowest possible price would be $3900. Despite Bermudez' objections, Verzino stuck to this price and Bermudez finally agreed.

Arrangements were then made for the sale. Verzino instructed Bermudez to park his car somewhere around 15 blocks from the 292 Club, leaving the money in the trunk. He was then to take a cab to the bar and give Verzino his keys. It was estimated that the whole transaction would take no more than one hour.

On September 23, at around 11:00 p. m., Bermudez again met Verzino and Sancinella at the 292 Club and stated that he was interested in purchasing an eighth of a kilo of heroin that evening. Verzino, however, refused to break a quarter kilo package and again outlined the procedure for the actual delivery. Bermudez then agreed to return the following evening with the $3900 for a quarter kilo. On Bermudez' inquiry as to the quality of the goods, Sancinella assured him, "It's 86 per cent."

The following evening, after conferring with other federal and local narcotics agents, Bermudez drove his car to East 143rd Street between St. Ann's Avenue and Brook Avenue in the Bronx, parked it there and took a cab to Courtland Avenue and 149th Street. He arrived at the 292 Club on foot at around 8:30 p. m. and met Verzino, who was just entering the bar. Moments before, Verzino had been observed in conversation with appellant Anthony Baratta, who had driven off in a black Cadillac convertible at the conclusion of the conversation. Verzino informed Bermudez that had he arrived at 8:00 p. m. the purchase and delivery could have been made at that time, but that as it was he would have to wait until around 10:00 p. m. Bermudez said he did not mind waiting and they entered the bar. Once inside, Bermudez informed Verzino that contrary to instructions, he had not left the money for the narcotics in his parked car, but had brought it along with him to the bar because of his apprehension that some dispute as to the amount might arise if he did not personally deliver the money to Verzino. Verzino expressed no objection to such a procedure and suggested that they go into

the kitchen and count the money. In the kitchen Verzino and Bermudez found Monastersky and Sancinella, who were cooking spaghetti and meatballs. At the request of Verzino, Monastersky and Sancinella each assisted in counting a portion of the money that Bermudez produced. The counting revealed that the $3900 was all there, the money was returned to Bermudez, and Verzino and Bermudez returned to the bar followed by Sancinella and Monastersky.

At about 9:50 p. m. one America Vega entered the 292 Club and asked to speak privately with Verzino. After he had spoken with her briefly, Verzino walked over to Bermudez and asked him for his car keys. The latter handed them over along with a piece of paper describing the car and its location. These were given to Vega, who put them in her pocketbook and, after having a drink with Verzino and Bermudez, left the bar.

About 15 minutes thereafter, Baratta entered the 292 Club and walked over to Verzino, who said, "Here's my delivery man." Verzino and Baratta left the club together, and Bermudez followed a minute or two later. Bermudez saw Baratta sitting in a black Cadillac convertible parked on Courtland Avenue just off 149th Street and Verzino standing beside the car. He turned and started back to the club and was joined a few moments later by Verzino, who stated, "It won't be long now." Baratta was then observed proceeding in the Cadillac to East 148th Street, where he entered the passenger side of a 1963 Oldsmobile already occupied by another individual. A moment later, both persons emerged from the Oldsmobile, Baratta carrying a package and a light colored raincoat. They got into the Cadillac and Baratta drove it away. After driving repeatedly through East 149th Street they proceeded to a building at 435 West 238th Street in Riverdale. One of the occupants of the car entered the building and returned shortly, and the car was driven back to the Bronx. At about 10:30 p. m. Baratta was ob-

served parking the Cadillac behind Bermudez' Rambler and then grasping the handle of the Rambler's door. He did not open the door but returned to the Cadillac and proceeded to cruise around the neighborhood.

Meanwhile, Bermudez waited at the 292 Club. At about 11:30 p. m. he complained to Monastersky, "It's taking too long." The latter reassured him, "Take it easy, kid. Don't worry about it. Everything will be okay. * * * He'll be here." Half an hour later Bermudez asked Sancinella, "What's going on here? * * * I'm here since 8:30." Sancinella replied, "Kid, don't worry. If Tony said you got it, you got it. Just sit tight and wait."

Near midnight Vega entered the club. Verzino, quite agitated, upbraided her, demanding "Where is he now? * * * I don't like this deal. It's taking too long. * * *" She reassured him, "He'll be here, he'll be here." Verzino left Vega with Bermudez temporarily but soon returned and complained again about the delay in consummating the deal. When Vega offered to go find out what had happened, however, Verzino told her to stay where she was and went off himself to make a phone call.

At about 1:45 a. m. on the 25th, Baratta entered the bar and was accosted by Verzino. The two of them walked outside followed by Bermudez. As Bermudez approached, Verzino said, "He's been waiting since 8:30." Baratta turned to Bermudez and said, "I'm sorry, it's my fault. I was held up." Verzino ordered Bermudez back into the bar and then re-entered alone a few moments later and returned to Bermudez his car keys, stating that the deal would take place right in the bar. Bermudez suggested that the money be recounted and Verzino assented. Verzino and Bermudez then counted out the money in the men's room, while, at Bermudez' request, Sancinella stood guard outside the door to make sure that no one entered while the counting was taking place.

A few minutes later, at about 2:00 a. m., Verzino left the club alone and walked westward to the corner of Morris Avenue and East 149th Street and then continued along toward Park Avenue. At a service station between Morris and Park Avenues, Verzino and Baratta were observed to walk toward each other, and then after a movement of hands between them, to separate almost immediately. Baratta went toward the Grand Concourse, while Verzino returned toward the 292 Club. At about 2:05 a. m. Verzino re-entered the Club with a package, which he put under Bermudez' jacket. He then took out of Bermudez' inside jacket pocket the $3900. The package, which was introduced into evidence, contained a powder which was determined to be composed 43.1% of pure heroin.

The only defendant who offered evidence at the trial was Baratta, who testified in his own behalf. Baratta sought to explain his presence at the 292 Club and his meetings with Verzino during the evening of September 24–25, 1963 by stating that at that time he had been unemployed for some time, that he was destitute, and that he had been seeking to borrow $200 from Verzino, a casual acquaintance. He testified that sometime prior to September 24th he had been told by Verzino to come to the 292 Club the following week and that Verzino might have some money for him. Baratta stated that when he first arrived at the club, he was told by Verzino that the $200 was not then available, but that it might be later on in the evening. Lacking carfare to return home, Baratta accepted Verzino's offer of the use of his Cadillac. He testified that he returned to the 292 Club at about 1:00 a. m. on the 25th, but that Verzino was still unable to loan him any money. Somewhat annoyed, Baratta left the bar on foot and started home in a cab. He said that he then remembered that he had not returned to Verzino the keys to the Cadillac, so he left the cab and started to walk back to the 292

Club. Before he reached the club he encountered Verzino, who said that he was looking for him. He handed over the keys, borrowed $5 for cab fare, and never saw Verzino again.

On cross-examination, Baratta testified that he had been living at 435 West 238th Street, Riverdale during the fall of 1963 and that he was living in a rented house at Greenwood Lake, New Jersey at the time of his arrest in the summer of 1964. He stated that at the time of his arrest he was using his own name and denied that he had been living under the name of Philip Barrone. During the course of his cross-examination he was handed a piece of paper which had been identified *in camera* as a statement taken from Baratta shortly after his arrest, and was asked whether this refreshed his recollection as to whether he had ever lived under the name of Philip Barrone. He replied in the negative. The jury was not told what the piece of paper was or what it contained. Baratta was also shown documents reflecting the purchase of a Chris-Craft boat and a 1964 Buick automobile by one Philip Barrone, as well as a baptismal certificate, an automobile registration, a driver's license and a check book in that name. He denied that he had ever seen these documents before or that they were in his possession at the time of his arrest.

In rebuttal, the Government offered the testimony of narcotics agent David Martowsky, one of the officers who had arrested Baratta at Greenwood Lake. Agent Martowsky identified the various documents which had been shown to Baratta on cross-examination as having been found and seized at the time of Baratta's arrest in the room where he was arrested and in a red Thunderbird automobile parked in the driveway of his house. These documents were then offered and received into evidence.

I.

First of all, Baratta contends that the use of his prior written statement to "refresh his recollection" on cross-examination violated the rule laid down by the Supreme Court two years after his arrest in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Government concedes that the statement had not been taken in accord with the procedure required by *Miranda* but urges that the use of the statement merely to refresh Baratta's recollection on the witness stand, where the statement was not identified, read, or otherwise independently presented to the jury, and where Baratta testified that his recollection was not refreshed, could have had no prejudicial effect against Baratta which would require that his conviction be vacated. Alternatively, the Government maintains that the use of the statement for collateral impeachment purposes was proper under the doctrine of Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) as applied in this Circuit in United States v. Curry, 358 F.2d 904, 910–912 (2d Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966) and United States v. Armetta, 378 F.2d 658, 661–662 (2d Cir. 1967). See also United States v. Mullings, 364 F.2d 173, 176 n. 3 (2d Cir. 1966). Since under the circumstances of this case we are in accord with the Government's first position, it is not necessary to determine the validity of its second and alternative contention.

The statement in question was a written question and answer statement obtained from Baratta by an Assistant United States Attorney who interviewed him shortly after he was arrested on July 11, 1964.[3] Among Baratta's

---

3. Throughout the proceedings below there was considerable confusion as to when Baratta had actually been arrested. On February 15, 1965 Baratta's counsel filed a motion for suppression of evidence seized at the time of his arrest. The sole ground for this motion was that Baratta had not been brought before a United States Commissioner in the District in which he was arrested and that no hear-

recorded answers there was apparently an admission that at the time of his arrest he was using the name of Philip Barrone. The Government readily admits that prior to giving the statement in question Baratta had not been fully informed of his constitutional rights to remain silent and to consult with counsel, and agrees that the statement was inadmissible in evidence under the doctrine of *Miranda*. However, in the present case, the statement was not admitted into evidence or identified as a statement or admission. Nor were its contents imparted to the jury in any way. The prosecutor merely handed the statement, a piece of paper, to Baratta during his cross-examination and asked if reading it would refresh his recollection as to whether he had ever gone under the name of Barrone.

 It is basic evidence law that a witness' recollection may be properly refreshed by writings and papers which are not in themselves admissible in evidence, e. g., 3 Wigmore on Evidence §§ 758–765 (3d ed.), and that the propriety of refreshing a witness' recollection on cross-examination lies largely within the sound discretion of the trial judge. 3 Wigmore § 765; United States v. Graham, 102 F.2d 436, 441 (2d Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939); United States v. Lombardozzi, 335 F.2d 414, 417, 10 A.L.R.3d 826 (2d Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964). The question is, though, whether the use made of Baratta's statement in the present case was such a use as is precluded by *Miranda*. Although we can certainly conceive of situations where the use of an improperly obtained statement, not itself admitted into evidence

or read to the jury, would violate *Miranda*, under the circumstances of the present case we find that the statement as such could have had no impact on the jury and that any error which might have been committed was harmless. Even if the jury did get some inkling that the statement was an admission by Baratta that he had used the name Barrone at some time in the past, such an admission would have been merely cumulative to the massive documentary evidence on this point that was offered by the Government in rebuttal. If this documentary evidence was properly admitted, as we hold it was, infra, it is inconceivable that the jury's verdict was "substantially swayed by the error," Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or that there is even "a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). On the record before us we are convinced that no prejudice could possibly have resulted from the use made of Baratta's statement. See United States v. Castellana, 349 F.2d 264, 276 (2d Cir. 1965), cert. denied, 383 U.S. 928, 86 S.Ct. 934, 15 L.Ed.2d 847 (1966); United States v. Guerra, 334 F.2d 138, 143–147 (2d Cir.), cert. denied, 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346 (1964).

 In addition, Baratta attacks the admission into evidence of the various documents seized by federal agents at the time of his arrest at his home at Greenwood Lake. These items, together with $5260 in cash, were found at the time of Baratta's arrest in the bedroom where he was arrested and in a Thunder-

---

ing had been held directing his removal to the Southern District of New York pursuant to Fed.R.Crim.P. 40(a). At the time of this motion Baratta's counsel was concededly under the misapprehension that Baratta's arrest had occurred on July 13, 1964, the date on which a formal complaint against Baratta was filed with the United States Commissioner in New York. This misapprehension was

shared by the presiding judge, who denied the motion stating that "the defendant was arrested on July 13 on the basis of a complaint * * * properly filed with the U. S. Commissioner." Actually, as finally came out at trial, Baratta was arrested on July 11, 1964 without a warrant, and the complaint very likely was filed at his preliminary examination on July 13.

bird automobile parked in the driveway at the house. Baratta maintains that because the federal agents did not have a search or arrest warrant at the time of his arrest these articles were unlawfully seized and hence inadmissible under the doctrine of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 654 (1914). The defect in this contention is that it clearly appears from the record that the arrest of Baratta was supported by an abundance of probable cause in the form of the information supplied by Bermudez and his fellow narcotics agents, and hence was lawful even without a warrant. United States v. Hall, 348 F.2d 837, 841 (2d Cir.), cert. denied, 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355 (1965). And a search incident to such a lawful arrest may be properly carried out without a search warrant. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925). See also Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The contemporaneous search of the room in which a defendant is properly arrested and a car, admittedly belonging to the defendant, parked in the driveway of the premises on which he was arrested is clearly a search incident to a lawful arrest. E. g. United States v. Francolino, 367 F.2d 1013, 1016–1019 (2d Cir. 1966), cert. denied, 386 U.S. 960, 87 S. Ct. 1020, 18 L.Ed.2d 110 (1967); Browning v. United States, 366 F.2d 420, 422 (9th Cir. 1966). Compare United States v. Rabinowitz, supra, and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and Abel v. United States, 362 U.S. 217, 234–240, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) and

Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) and Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) with Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) and Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L. Ed.2d 876 (1957). We therefore conclude that the items seized as a result of this search were properly admitted into evidence at Baratta's trial.[4] Having sustained the legality of the search and seizure, we do not consider the Government's alternative contention that, even if these documents were illegally seized, they were nevertheless admissible in evidence under the rule of Walder v. United States, supra, to impeach Baratta's testimony on a collateral issue.

## II.

Both Monastersky and Sancinella claim that the evidence adduced against them at the trial was insufficient to establish the knowledge of illegal importation necessary for conviction of the crimes with which they were charged. It is not a crime under 21 U. S.C. § 174 for a person to deal in narcotic drugs, unless it is shown that the person did so "knowing the same to have been imported or brought into the United States contrary to law." See United States v. Santore, 290 F.2d 51 (2d Cir. 1959), rehear en banc, 290 F.2d 74 (2d Cir. 1960), cert. denied, 365 U.S. 834, 81 S.Ct. 749, 5 L.Ed.2d 744 (1961); United States v. Hernandez, 290 F.2d 86 (2d Cir. 1961). However, section 174 also provides that "[w]henever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession

4. When the items in question were offered and received in evidence, Agent Martowski testified that at the time of the arrest and search he had asked Baratta whether the Thunderbird automobile, the $5260 in cash found therein, the auto registration certificate and the driver's license belonged to him, and that Baratta had replied in the affirmative. It is not clear whether Baratta now complains

of the admission of this testimony as a violation of the *Miranda* rule, but even if such responses are not properly admissible under *Miranda*, a question which we do not here decide, on the record as a whole, their admission in evidence cannot be said to have prejudiced this defendant. See United States v. Castellana, supra; United States v. Guerra, supra.

shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury." Since the record in the present case is bare of any direct evidence that either Monastersky or Sancinella had actual knowledge of illegal importation, their convictions may only be sustained by sufficient evidence that they had such "possession" of the narcotics as would support the statutory inference. It is well established that a person may have possession for the purposes of section 174, even though he does not have physical custody, so long as he has dominion and control over the narcotics. United States v. Jones, 308 F.2d 26, 30 (2d Cir. 1962); United States v. Hernandez, 290 F.2d supra at 90. As this Court has recently stated, possession may consist of "a working relationship or a sufficient association with those having physical custody of the drugs so as to enable [one] to assure their production, without difficulty, to a customer as a matter of course * * *"; but, on the other hand, "a casual facilitator of a sale, who knows a given principal possesses and trades in narcotics but who lacks the working relationship with that principal that enables an assurance of delivery, may not be held to have dominion and control over the drug delivered and cannot be said to have possession of it." United States v. Jones, supra; see also United States v. Hernandez, supra; United States v. Santore, supra 290 F.2d at 76. Applying this test, after a close examination of the present record, we find that the evidence was sufficient to sustain the convictions of both of these defendants.

■ Turning first to Sancinella, the record reveals that his role in the events surrounding the sale of narcotics to Bermudez was far more than that of a casual facilitator. First of all, Sancinella was present during much of the negotiations for the purchase and participated actively in them. He quoted a purchase price and also specified the quality of the goods. Further, he was present on the night of the delivery and was able to assure Bermudez that delivery would in fact be made, despite the long delay. He was entrusted to help count the purchase money in the kitchen and to guard the men's room while it was being recounted. This evidence of Sancinella's involvement is substantially greater than the evidence which we held insufficient in United States v. Jones, supra. It indicates that Sancinella was an integral part of the narcotics distribution operation and that he enjoyed a close and continuous working relationship with those who had actual possession of the narcotics. This working relationship was enough to constitute possession of the narcotics and to support the statutory inference. See United States v. Beigel, 370 F.2d 751, 756 (2d Cir.), cert. denied, 387 U.S. 930, 87 S.Ct. 2049, 18 L.Ed.2d 989 (1967) (Beigel), 387 U.S. 936, 87 S. Ct. 2062, 18 L.Ed.2d 998 (1967) (Verzino); United States v. Lopez, 355 F.2d 250 (2d Cir.), cert. denied, 384 U.S. 1013, 86 S.Ct. 1979, 16 L.Ed.2d 103 (1966); United States v. Rivera, 346 F. 2d 942 (2d Cir. 1965); United States v. Carter, 320 F.2d 1 (2d Cir. 1963); United States v. Douglas, 319 F.2d 526 (2d Cir. 1963); United States v. Ramis, 315 F.2d 437 (2d Cir. 1963); Lucero v. United States, 311 F.2d 457 (10th Cir. 1962), cert. denied sub nom., Maestas v. United States, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963).

With respect to Monastersky, the evidence as to his possession is even more substantial. It was at his request in the first place that Verzino offered to help out Ciccone in his dealings with Bermudez. He participated actively in the negotiations, especially in the beginning, and like Sancinella was involved in the counting of the money. He was the one who "checked out" Bermudez as a potential customer, and he was at various times able to assure Bermudez of the quality of the goods and of delivery. It is clear that he had a working relationship with the actual possessors of the narcotics sufficient to assure production of the goods at any time, and thus sufficient to support the statutory inference. See

United States v. Beigel, supra; United States v. Lopez, supra; United States v. Rivera, supra; United States v. Carter, supra; United States v. Douglas, supra; United States v. Ramis, supra; Lucero v. United States, supra.

### III.

Baratta has urged that the trial court's charge was erroneous in the following four respects: (1) The trial judge erred in charging the jury as to the first count in the language of the general federal conspiracy statute, 18 U.S.C. § 371 (1964), rather than in the language of the conspiracy portion of 21 U.S.C. § 174 under which the defendants were in fact indicted; (2) In his charge on the conspiracy count the trial court failed to instruct the jury that knowledge of illegal importation of the narcotics is an essential element of the crime of conspiracy under section 174; (3) During his explanation to the jury of the statutory inference of knowledge of illegal importation from possession the court used the statutory language "unless the defendant explains the possession" in derogation of the defendants' Fifth Amendment rights; (4) The court used language which would allow the jury to employ a preponderance of evidence standard in determining the guilt or innocence of the defendants. Baratta further maintains that even if no single one of these alleged errors would require reversal of his conviction, taken cumulatively, they cast sufficient doubt on the fairness of his trial as to make a new trial mandatory. We hold that, although the charge was erroneous in several respects, the errors were not sufficiently egregious or likely to have caused prejudice to warrant reversal when, save as to item (2), no adequate objection was made.

■ With respect to the first error alleged, it does seem clear from the record that the trial court charged the jury as to the first count under the general conspiracy statute rather than the conspiracy clause of section 174. However, there was no exception taken to this portion of the court's charge, and this is precisely the type of error that could have been corrected had it been brought to the trial judge's attention. Moreover, it is difficult for us to see how the defendant could have been prejudiced by this mistake. See United States v. Massiah, 307 F.2d 62, 68, 70 (2d Cir. 1963), rev'd on other grounds, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). At any rate, we do not consider that it was such "plain error" as to justify reversal of the convictions in the absence of exception below. See Fed.R.Crim.P. 30, 52 (b).

■ The next error assigned by Baratta is a more serious one. In United States v. Massiah, supra 307 F.2d at 69–71, a majority of the court held that failure to instruct the jury that knowledge of illegal importation is an essential element of a section 174 conspiracy was plain error, see Fed.R.Crim.P. 52 (b), requiring reversal even without timely exception by the defendant. As the court there said, "In a criminal case, the defendant is entitled to have the jury instructed on all the elements that must be proved to establish the crime charged." 307 F.2d at 71. In the present case it is conceded that the trial court did not specifically instruct as to the requirement of knowledge of illegal importation on the conspiracy count, and that counsel for Monastersky and Sancinella took timely exception to this omission.[5] On the other hand, it is also not disputed that the charge adequately informed the jury as to the knowledge of illegal importation required for the substantive crime and that the trial court did charge that the jury must find that each defendant "wilfully and knowingly joined a conspiracy to violate that substantive law relating to the sale of nar-

---

5. Counsel for Baratta did not except to the charge on this ground. We are not, however, going to hold this against him, since we feel that the point was sufficiently brought to the attention of the trial court by the exceptions of counsel for the other defendants.

cotics." Cf. United States v. Agueci, 310 F.2d 817, 824–826 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L. Ed.2d 11 (1963); United States v. Bentvena, 319 F.2d 916, 938–940 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). Furthermore, in launching into his discussion of the substantive aspects of the offenses charged, the trial court stated,

> In order to find a defendant guilty of the crimes charged in *either or both* counts 1 and 2 in the indictment, you must be convinced beyond a reasonable doubt with respect to each of the first two counts and with respect to each of the following four elements:
>
> \* \* \* \* \* \*
>
> The third element that must be proven beyond a reasonable doubt is that the narcotic drugs were illegally imported into the United States; and, fourth, and this, too, must be proven beyond a reasonable doubt, that each defendant knew that these narcotic drugs had been illegally imported into the United States. (Emphasis supplied.)

Although these statements do not take the place of an explicit treatment of the knowledge of illegal importation required for conviction on the conspiracy count, so far as these defendants were concerned any defect in the charge as to this element was cured by the jury's finding of the guilt of all appellants of both the substantive offense and the conspiracy. Since the instruction as to knowledge of illegal importation with respect to the substantive offense was more than sufficient, and since the jury found all appellants guilty of the substantive offense, they must have found that each of them had the requisite knowledge of illegal importation or such possession of the narcotics as to justify the statutory inference, discussed supra.[6] Cf. United States v. Bottone, 365 F.2d 389, 394–395 (2d Cir. 1966).

■ The third error alleged is that, in referring to the statutory inference of knowledge of illegal importation from possession of narcotics, the trial court used language tending to undermine the Fifth Amendment rights of the defendants not to be compelled to testify. In his original charge the court explained the statutory inference in the language of the statute, "\* \* \* such possession shall be deemed sufficient evidence to authorize conviction unless *the defendant* explains the possession to the satisfaction of the jury." (Emphasis supplied.)[7] The use of the word "defendant" in this context has been expressly disapproved by this Court in United States v. Nuccio, 373 F.2d 168, 174 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688 (1967) and United States v. Armone, 363 F.2d 385, 392–393 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966). See also United States v. Gainey, 380 U.S. 63, 71 n. 7, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). But, in the present case, when this slip was called to his attention by exception immediately following the body of the charge, the trial judge corrected his error and reinstructed the jury in more appropriate language, substituting "unless the evidence explains the possession" for "unless the defendant explains the possession." Under these circumstances, we do not hold that his initial slip of the tongue constituted reversible error.[8]

---

6. This was not the case in United States v. Massiah, supra. In *Massiah*, three of the four defendants were charged and convicted only of conspiracy. Moreover, the majority of the court in that case also found that "other statements in the court's general discussion of the law of conspiracy suggested to the jury that knowledge of importation was not necessary. \* \* \*" 307 F.2d at 70. We find no such statements in the charge before us. Cf. United States v. Agueci, supra.

7. See n. 1, supra.

8. In his discussion of the statutory inference the trial court erroneously designated the section 174 inference as a presumption. See Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946); United States v. Evans, 312 F.2d 556 (2d Cir. 1963). However, although

 Finally, Baratta claims that the trial judge erred, when toward the end of his charge he stated,

In the final analysis, then, if you find that the evidence respecting each defendant is as consistent with innocence as with guilt or that it is more likely that each defendant is innocent than guilty, then you should acquit each defendant. If you find that the law has not been violated, you should not hesitate for any reason to return a verdict of not guilty.

In so instructing the jury, the judge used language which this Court has expressly condemned in United States v. Hughes, 389 F.2d 535, 537 (2d Cir. 1968) as "erroneously allow[ing] the jury to use the preponderance of evidence standard in a criminal case." Cf. United States v. Guglielmini, 384 F.2d 602, 606–607 (2d Cir. 1967). In the *Hughes* case, though, the erroneous instruction was combined with a highly improper summation, which was the main ground for vacating the conviction, and the court expressly refrained from determining whether the use of the above language, standing alone, would constitute such plain error as to require reversal even without exception below. 389 F.2d at 537. In the present case, as in *Hughes*, there was no exception taken to the use of this language, which could have been readily corrected had objection been made, and the trial judge had earlier in his charge fully and correctly defined the burden of proof resting on the Government. In answer to the question reserved in *Hughes*, we hold that under these circumstances the isolated use of this unfortunate phraseology is not one of those "plain errors or defects affecting substantial rights," Fed.R. Crim.P. 52(b), which would call for vacating these convictions. United States

the matter was brought to the court's attention below, it was not raised here on appeal. At any rate, in the light of the judge's charge as a whole on this point, we do not think that the jury was misled by his isolated mistaken use of the word "presumption." See United States v. Fer-

v. Witt, 215 F.2d 580, 585 n. 4 (2d Cir.), cert. denied sub nom., Talanker v. United States, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954); see United States v. Birnbaum, 373 F.2d 250, 263 n. 17d (2d Cir.), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).

In addition to the claims discussed above, Baratta contends that his conviction should be reversed because of defects in the indictment, because of insufficient evidence of his guilt of the offenses charged, because the indictment was largely based on hearsay testimony of a single narcotics agent, because he is the victim of double punishment for a single offense. These contentions are so patently without merit that they do not warrant discussion.

Affirmed.

rara, 377 F.2d 16, 18 (2d Cir.), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L. Ed.2d 225 (1967); United States v. Morton, 376 F.2d 606 (2d Cir.), cert. denied, 389 U.S. 887, 88 S.Ct. 176, 19 L.Ed.2d 165 (1967); United States v. Nuccio, supra.