[No. B033638. Second Dist., Div. Three. Aug. 26, 1988.]

RICHARD FRIO et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
DONALD IERACE et al., Real Parties in Interest.

**COUNSEL**

Wehner & Perlman, Charles C. Wehner and Patrick J. Grannan for Petitioners.

No appearance for Respondent.

Dern, Mason & Floum, Richard H. Floum, Edward G. Burg and James A. Sedivy for Real Parties in Interest.

**OPINION**

**KLEIN, P. J.**—Petitioners Richard Frio and Carousel Records (Frio) seek writ review of a pretrial order precluding Frio's testimony about the

contents of separate telephone conversations between Frio and real parties in interest, Carl Maduri (Maduri), Mike Belkin (Belkin), principals of Belkin Maduri Organization, Inc. (BMO), Donald Ierace, professionally known as Donnie Iris (Iris) (collectively, real parties) and others.

The trial court based its order on Frio's admission he had prepared notes of some telephone conversations from tape recordings made by his telephone answering machine and had reviewed those notes prior to his deposition. Frio's testimony concerning these conversations was excluded by the trial court based upon Penal Code section 632, subdivision (d),[1] which excludes any evidence "obtained as a result of eavesdropping upon or recording a confidential communication in violation of" section 632.[2]

We conclude Frio's testimony relating his present recollection of the contents of telephone conversations with others, even if refreshed by notes prepared in part by reference to tape recordings made in apparent violation of section 632, is not evidence obtained as a result of the illegality. Properly considered, such testimonial evidence is the result of Frio's lawful firsthand participation in the telephone conversations. Therefore, the trial court's order excluding such testimony is excessive and is reversed.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 1980, Frio, an independent record producer, entered into a contract with Iris's management, BMO, whereby Frio, pursuant to a preexisting understanding with MCA, agreed to produce Iris's record albums which then would be marketed to the public through MCA.

This agreement governed the conduct of the parties through the production and marketing of four Iris albums. However, a dispute arose during the pendency of the production of the fifth album which prompted real parties, early in 1984, to sue Frio in an effort to end their relationship. Frio cross-complained, seeking damages arising out of real parties' claimed breach of contract.

During discovery, Frio produced 671 pages of typed, double-spaced notes of his telephone conversations with the parties to the litigation and others, compiled from May 1983 through June 1985. At his deposition in 1987,

---

[1] All subsequent statutory references are to the Penal Code, unless otherwise indicated.

[2] Section 632, subdivision (a), provides: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, . . ." is guilty of an alternate misdemeanor felony.

Section 632, subdivision (d), provides: "Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding."

Frio testified he had prepared notes of all meetings and telephonic conversations pertaining to the Iris contract. These notes were either handwritten or dictated and then typed. After Frio reviewed the notes for accuracy, they were placed in three-ring binders.

Frio admitted he had tape-recorded "some conversations" with Maduri and possibly had recorded telephone conversations with Irving Azoff, president of MCA, Belkin and Iris by means of his telephone answering machine. Frio then made "notes of the conversations for [his] records." "The phone would ring, the answering machine would pick up, we talked and it would record." "If I was on the phone I would make a note, and if it was taped at the same time then it would reinforce my notes. And if it wasn't taped at the same time I would still have notes."

However, Frio could not tell by reference to his typed notes which conversations had been taped and which had not. Because Frio reused the tapes in the answering machine, no recordings of any of the conversations are now available.

Frio stated in his deposition the reason he began using the tapes to assist in the compilation of notes was because sometime in the spring of 1983 Maduri told him "Belkin was going to attempt to make some sort of an end run. . . . [A]t first he was going to attempt to make an offer to buy me out of the contract, and if that didn't work he would make an attempt to ace me out of my contract."

Frio recalled that Maduri offered to buy out the contract in April of 1983. This upset Frio because he "had worked with Donnie [Iris] for four L.P.'s . . . and felt . . . Iris was one record away from being the superstar that he deserved to be and—due to my input and input of several other people. I think we should all have benefited from his great success, which was in the offing. That I didn't think it was a good idea for me to sell off my portion of the contract."

Frio admitted he had reviewed his notes "[o]nce for sure, possibly twice" before testifying at his deposition.

Real parties moved to preclude Frio from offering into evidence at trial the contents of the telephone conversations embodied in the 671 pages of notes. The trial court granted the motion based upon the evidentiary sanction of section 632, subdivision (d).

The trial court's minute order granting the motion states, "[t]he record seems clear that Mr. Frio recorded the conversations in question, prepared the memorandum . . . from those recordings, and testified either directly from the memorandum or by using it to refresh his recollection in giving

testimony. That testimony is thus evidence 'obtained as a result' of the recording."

CONTENTIONS

Frio contends his independent recollection of the telephone conversations is admissible as evidence of the conversations in which he was a participant regardless of whether he used the notes to refresh his recollection.

Frio also asserts the notes prepared from the recordings do not violate section 632 and, finally, even if the trial court's order is affirmed, the notes are admissible for the purpose of impeachment.

DISCUSSION

1. *The Privacy Act, section 630 et seq.*

In section 630, the Legislature declared, "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. [¶] The Legislature by this chapter intends to protect the right of privacy of the people of this state."

Section 632 replaced former section 653j, which had required the consent of only one party to a conversation before it might be intercepted or recorded, and made it a crime intentionally to eavesdrop upon or record confidential communications without the consent of all parties.

The legislative history of section 632 is replete with references to the Legislature's intent to strengthen then existing law by "prohibiting wiretapping or 'electronic eavesdropping' *without the consent of all parties to the communication* which is being tapped or overheard." (Italics added.) (Analysis of Assem. Bill No. 860 prepared by Sen. Com. on Judiciary for Hearing Date June 15, 1967; Letter from Jesse M. Unruh to Gov. Ronald Reagan dated July 31, 1967; Rep. of the Assem. Com. on Crim. Procedure for the 1967 Gen. Sess.)[3]

Additionally, in discussing the applicability of section 631 to a defendant "accused of eavesdropping on plaintiff's conversations with his wife," our

---

[3] We utilize certain documents regarding legislative history furnished by the Legislative Intent Service, a commercial service which provides documents relating to the origin of California statutes. For an example of its use by the Supreme Court, see *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 218-219 [185 Cal.Rptr. 270, 649 P.2d 912].)

Supreme Court has noted "the Privacy Act has long been held to prevent one party to a conversation from recording it without the other's consent," citing *People* v. *Wyrick* (1978) 77 Cal.App.3d 903, 909 [144 Cal.Rptr. 38], and *Forest E. Olson, Inc.* v. *Superior Court* (1976) 63 Cal.App.3d 188, 191 [133 Cal.Rptr. 573]. (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 360 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417].)

■ Frio does not contend any of the persons with whom he spoke consented to the recordations. Further, assuming arguendo Frio intended to record the conversations and did not merely intend "to activate a tape recorder which subsequently 'by chance' records a confidential communication" (*People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 133 [74 Cal.Rptr. 294, 449 P.2d 230]), his conduct constitutes prima facie evidence of violations of section 632 if the communications were confidential.

### 2. *Nature of confidential communications.*

Section 632, subdivision (c), states a " 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

■ "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device." (*Ribas* v. *Clark, supra,* 38 Cal.3d at pp. 360-361.)

The test of confidentiality is an objective one defined in terms of reasonableness. (*People* v. *Wyrick, supra,* 77 Cal.App.3d at p. 909.) A communication must be protected if either party reasonably expects the communication to be confined to the parties.

### *Application here.*

■ The record does not reflect an express finding by the trial court as to the confidentiality of the communications embodied in the notes. However, the trial court could not have applied the exclusionary sanction of section 632, subdivision (d), without a preliminary determination the conversations were confidential. Frio attacks this implied finding by arguing the recorded conversations related to business matters and pending litigation, and

therefore concludes neither party to the communications reasonably could have considered them confidential.

Frio complains application of an objective test dictates a finding that all business communications lack confidentiality. In support of this broad proposition, Frio cites *People* v. *Pedersen* (1978) 86 Cal.App.3d 987, 994 [150 Cal.Rptr. 577].

In that case, Pedersen, the manager of a country club, arrived at the office of one of the general partners in response to a telephone request for his presence. Two or three general partners of the country club, two accountants and Pedersen attended the meeting. The partners questioned Pedersen ·about checks Pedersen had written. Pedersen "at one point told the others that if they thought he had done something criminal, then take the necessary steps." (86 Cal.App.3d at p. 994.) The *Pedersen* court approved admission into evidence of a surreptitiously obtained tape recording of this meeting, finding it had not been confidential.

There is little similarity between the face-to-face confrontational meeting in *Pedersen* and the telephone conversations addressed in the present case. The conversation in *Pedersen* involved an accusation of embezzlement. In addition to the rather substantial number of interested parties present at the meeting, Pedersen himself invited the scrutiny of law enforcement if the accusers thought he had committed a crime. Thus, Pedersen's conduct belied an expectation of confidentiality.

On the other hand, Frio's telephone communications with his various associates related to ongoing business matters which apparently were in a state of great flux. It would be unreasonable to conclude such conversations, as a matter of law, are not entitled to privacy protection as Frio urges, and certainly nothing in the statute or in the *Pedersen* case would dictate such a conclusion.

On the contrary, many businesses employ extensive security measures to prevent the disclosure of market data or business strategy of the type apparently under discussion in the Frio conversations. In fact, because Frio's business involved a few key people, a highly visible product and the potential for substantial profit, there is every reason to believe each of the tape recorded parties reasonably expected their communications would not be simultaneously disseminated to an unannounced second auditor.

Frio's further claim that the existence of litigation rendered all communications with him relating to the Iris contract unprotected is similarly unavailing. At his deposition, Frio conceded Maduri had told Frio specifically that certain of their discussions regarding Maduri's dealings with Belkin

were to be considered confidential in the more narrow sense of entrusted intimacies.

Moreover, even those telephone calls in which Frio asserts the caller boldly told Frio how his opponents intended to avoid their contractual obligations do not evince a conclusive absence of an expectation of privacy. All the telephone communications were conducted on a one-on-one basis and related to a profitable venture which the speaker reasonably might expect would be confined to the parties. The subject matter also appeared to be a sensitive one on a personal level as among the parties.

In sum, under section 632 "confidentiality" appears to require nothing more than the existence of a reasonable expectation by one of the parties that no one is "listening in" or overhearing the conversation. Clearly, the communications in issue meet this threshold standard.

However, even applying the concept of privacy more narrowly by defining it as a reasonable expectation that the content of the communication has been entrusted privately to the listener, the trial court's implied finding of confidentiality finds substantial support in the record.

3. *The exclusionary sanction.*

Section 632, subdivision (d), renders inadmissible all "evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section . . . ."

■ Any analysis of the statutory exclusionary rule of section 632, subdivision (d), must take into consideration the long-standing opinions of the United States Supreme Court governing the judicially crafted rule which excludes evidence obtained during an unlawful search. (*Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]; *Silverman* v. *United States* (1961) 365 U.S. 505 [5 L.Ed.2d 734, 81 S.Ct. 679, 97 A.L.R.2d 1277].)

Both rules seek to effectuate privacy rights, deter future violations and preserve judicial integrity by denying the wrongdoer the fruit of the illegally obtained evidence. Also, both rules burden the truth-seeking function of trial by keeping what may be the most probative evidence from the trier of fact. (*Stone* v. *Powell* (1976) 428 U.S. 465, 482-492 [49 L.Ed.2d 1067, 1081, 1087, 96 S.Ct. 3037].)

■ Logically, statutory and decisional exclusionary rules likewise should prohibit the introduction of evidence which is the derivative product of the primary evidence. However, it has long been recognized that indirectly acquired evidence is inadmissible only up to the point at which the

connection with the illegality becomes "so attenuated as to dissipate the taint." (*Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 312, 605 S.Ct. 266]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-485 [9 L.Ed.2d 441, 453, 83 S.Ct. 407].)

In addition to the concept of attenuating the taint, evidence otherwise inadmissible because of an illegal seizure might fall within the "independent source" exception to the exclusionary rule. (*Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426].) "That doctrine, which has been applied to evidence acquired not only through Fourth Amendment violations but also through Fifth and Sixth Amendment violations, has recently been described as follows: [¶] '[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position than they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' (*Nix* v. *Williams,* 467 U.S. 431, 443 (1984)." (*Murray* v. *United States* (1988) 487 U.S. 533, __ [101 L.Ed.2d 472, 480, 108 S.Ct. 2529].)

We apply these legal principles to the trial court's order.

a. *The trial court's order.*

The trial court found "Mr. Frio recorded the conversations in question, prepared the memorandum . . . from those recordings, and testified either directly from the memorandum or by using it to refresh his recollection in giving testimony. That testimony is thus evidence 'obtained as a result' of the recording." In so ruling, the trial court correctly determined the notes to be the direct product of the recordings but lumped together two frequently confused, but actually distinct, evidentiary concepts: testimony derived directly from a writing and testimony which merely has been refreshed by a writing.[4]

b. *Present recollection refreshed contrasted with past recollection recorded.*

*Present recollection refreshed* involves the use of a writing which has no purpose other than to refresh the memory of a witness. "It is basic

---

[4] The term "writing" is used as it is defined in the Evidence Code and includes "handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof." (Evid. Code, § 250.)

evidence law that a witness' recollection may be properly refreshed by writings and papers which are not in themselves admissible in evidence, e.g., 3 Wigmore on Evidence §§ 758-765 (3d ed.), . . ." *United States* v. *Baratta* (2d Cir. 1968) 397 F.2d 215, 222.) As stated by L. Hand, J., "Anything may in fact revive a memory: a song, a scent, a photograph, an allusion, even a past statement known to be false." (*United States* v. *Rappy* (2d Cir. 1946) 157 F.2d 964, 967.)

A writing used to refresh recollection is not admissible in evidence at the instance of the party whose witness has used it and it has no independent evidentiary value. (*Estate of De Laveaga* (1913) 165 Cal. 607, 631 [133 P. 307]; *Estate of Packer* (1913) 164 Cal. 525, 530 [129 P. 778]; *Vogelsang* v. *Wolpert* (1964) 227 Cal.App.2d 102, 126 [38 Cal.Rptr. 440].) "The primary evidence here is not the writing. It was not introduced in evidence. It was not offered. The primary evidence is the oral statement of the hostile witness. It is not so important when the statement was made or by whom if it serves the purpose to refresh the mind and unfold the truth." (*Hoffman* v. *United States* (9th Cir. 1937) 87 F.2d 410, 411.)

The refreshing document or portions thereof, however, may be admitted in evidence at the behest of an adverse party. (Evid. Code, § 771, subd. (b).)

By way of contrast, *past recollection recorded* involves a matter as to which the witness has insufficient present recollection to enable full and accurate testimony. In such instance, a written memorandum containing a statement of facts, which were fresh in the writer's mind at the time of the preparation of the memorandum, may be read in evidence as past recollection recorded. (Evid. Code, § 1237.) As in present recollection refreshed, the writing itself may not be received in evidence unless offered by an adverse party.

Thus, in present recollection refreshed the witness relates his or her own refreshed recollection of an event. In past recollection recorded, the witness has inadequate present recollection and merely reads in evidence a writing which itself contains the facts.

c. *Application here.*

Because past recollection recorded involves a witness unable to testify fully and accurately absent use of a written memorandum, such testimony falls within the proscription of section 632, subdivision (d). Neither the tainted recordings nor the notes derived from them can be read in evidence.

However, use of these same materials to refresh recollection does not involve reading or offering them in evidence. As such, section 632, subdivision (d), is not violated by using said materials in that fashion. The

witness's recollection of the communications derives in the first instance not from the illegal tape recordings or the notes prepared from them, but from the "independent source" of the witness's lawful firsthand participation in the conversations. The testimony thus remains the witness's independent recollection of the event.

Preventing Frio's testimony as to conversations of which he enjoys an untainted recall extends a measure of privacy no party to any conversation reasonably can anticipate or expect. Such a holding would not only exclude evidence obtained as a result of the illegality, the tape recordings, but would also preclude evidence independently obtained as a result of the conversation, the statements themselves. Nothing in the Privacy Act can be read so as to conclude a party whose confidential communications have been recorded gains greater protection than if they had not been so intercepted. The statute neither can, nor purports to, remove the risk inherent in speaking, namely, the risk the party to whom the remarks are addressed might later repeat the conversation.[5]

d. *Authority from other jurisdictions.*

(i) *Participant testimony re illegally recorded communication.*

While no California decisions address the issue presented here, cases from the States of Washington and Michigan, although reaching divergent results, are worthy of note.

The Washington privacy statute requires the consent of both parties or a warrant in order to record a confidential communication and provides "[a]ny information obtained in violation [of the privacy act] . . . shall be inadmissible . . . ." (Wash. Rev. Code § 9.73.050.) In *State* v. *Grant* (1973) 9 Wn.App. 260 [511 P.2d 1013], an appellate court ruled the Washington act did not preclude a police officer, who had not been party to an aural interception which was legal under federal law but improper under state law, from testifying as to the contents of the recorded telephone conversation.

However, in *State* v. *Williams* (1980) 94 Wn.2d 531 [617 P.2d 1012], the Supreme Court of Washington chose not to extend that holding to an informant who knew of the state law illegality. The *Williams* court reasoned "[u]nlike the situation in *Grant,* the federal agents and informant who

---

[5] We note the possibility the taping participant, here Frio, might attempt to use the evidentiary sanction of section 632, subdivision (d), to prevent an adverse party from introducing portions of the refreshing document. However, by seeking to introduce evidence obtained as a result of a violation of section 632, the tape-recorded party thereby waives its protection. Further, allowing such offensive use of section 632 by the party who violated it offends fundamental notions of fairness.

participated in the conversations in the present case knew of, and took part in the illegal recordings of the conversations, and therefore obtained the information from the conversations in an unlawful manner." (*Id.,* at p. 1019.) The court concluded the purpose of the statute was the protection of the privacy of individuals from public dissemination and precluded not only the introduction of the tape recordings obtained but also the testimony of the civilian informant who participated in the conversation.

*Williams* places heavy reliance on knowledge of the illegality. However, knowledge that an action is illegal is not a prerequisite to a finding of criminality. Indeed, it appears irrelevant in determining whether the recording party may recount statements made in the recorded communication. Therefore, we believe *Williams* to be decided wrongly. Better reasoned, in our view, are cases from Michigan.

In *People* v. *Beavers* (1975) 393 Mich. 554 [227 N.W.2d 511], the Michigan Supreme Court held the warrantless monitoring of a conversation between the accused and an informant rendered the monitoring officers' testimony inadmissible but did "not in any way prevent the informant from testifying as to the statement spoken to him *directly.*" (*Id.,* at p. 516.) In construing this decision, a Michigan appellate court reasoned "[t]he fact that Sergeant Jurkas [an undercover informant] refreshed his memory by referring to his own notes should not make his testimony objectionable. Prior to making his notes he would *sometimes* listen to the tapes but would then use his independent knowledge and refreshed memory in making the notes. Witnesses testifying from memory are traditionally allowed to refresh their recollection from their own prepared notes. [Citation.]" (*People* v. *Rowan* (1977) 76 Mich.App. 124 [255 N.W.2d 791, 792].)

 (ii) *Use of any illegally acquired evidence to refresh recollection.*

We acknowledge that the evidence used to refresh the memory in this instance was acquired in apparent violation of section 632, subdivision (d). However, we are unaware of any decision holding that a witness may not testify after simply refreshing recollection with tainted evidence.

In *Baratta,* the "prosecutor merely handed the statement, a piece of paper, to Baratta during his cross-examination and asked if reading it would refresh his recollection as to whether he had ever gone under the name of Barrone." (*United States* v. *Baratta, supra,* 397 F.2d at p. 222.) The statement embodied in the paper had been obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The *Baratta* court did not directly address the issue but found any error which might have been committed was harmless in light of the over-

whelming "documentary evidence on this point that was offered by the Government in rebuttal." (*United States* v. *Baratta, supra,* at p. 222.)

Despite the *Baratta* court's avoidance of the issue, *20th Century Wear, Inc.* v. *Sanmark-Stardust Inc.* (2d Cir. 1984) 747 F.2d 81, 93, footnote 17, cited *Baratta* and rejected the argument that an unethically obtained tape recording could not be used merely "to refresh recollection." (Accord, *United States* v. *Kusek* (2d Cir. 1988) 844 F.2d 942, 949.)

■ Frio's memory of the conversation in which he participated, is independent of the illegality and is not so tainted by mere refreshing with an illegally obtained writing so as to render it inadmissible.

### e. *Procedure to be utilized by trial court upon remand.*

Upon remand the trial court must determine those matters as to which Frio has a present recollection, refreshed or otherwise, and those as to which he does not.

"Of course, the categories, present recollection revived and past recollection recorded, are clearest in their extremes, but they are, in practice, converging rather than parallel lines; the difference is frequently one of degree. . . . [¶] Properly, the burden to ascertain the state of affairs, as near as may be, devolves upon the trial judge, who should in the first instance satisfy himself [*sic*] as to whether the witness testifies upon a record or from his own recollection. It is upon this satisfaction that the reception of the evidence depends, for if it appear[s] to the court that the witness is wholly dependent for the fact upon the memorandum he holds in his hand, the memorandum acquires a significance which, as stated, brings into operation certain guiding rules. Similarly, the trial judge must determine whether the device of refreshing recollection is merely a subterfuge to improperly suggest to the witness the testimony expected of him. It is axiomatic, particularly with respect to the reception of evidence, that much depends upon the discretion of the trial judge." (*United States* v. *Riccardi* (3d Cir. 1949) 174 F.2d 883, 889.)

### f. *Criminal and tort liability of recording party.*

Use of the evidentiary sanction of section 632, subdivision (d), to exclude more than the direct product of the illegality also works an improper multiple punishment upon the recording party. The Privacy Act specifically addresses the criminal liability of a monitoring participant by punishing violations of section 632 upon a first offense by a fine not exceeding $2,500 or imprisonment in the county jail or in the state prison and upon a second offense by a fine not exceeding $10,000 or imprisonment in the county jail or in the state prison.

In addition, section 637.2 states "[a]ny person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of" $3,000 or three times the amount of actual damages sustained.

In light of the express and substantial sanction imposed by the Privacy Act itself, excluding more than the direct product of the illegality, the tapes and the notes, would be disruptive of the balance struck by the Legislature favoring the right of privacy at the expense of the truth-seeking function at trial by excluding what we have observed as arguably the best evidence of the speaker's communication. Any increase in the scope of the sanction by completely precluding the secondhand testimony of the monitoring participant should be undertaken by the Legislature, not the courts.

### 4. *Blanket exclusion arguments unpersuasive.*

Real parties' analogy to *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775], in which our Supreme Court held inadmissible the testimony of a hypnotized witness as to all matters that were the subject of the hypnotic session, is inapt.

The *Shirley* court held such testimony inadmissible because it is inherently unreliable. "[H]ypnotizing a witness to improve his [or her] memory is not in fact like 'any other method' of refreshing a witness' recollection. . . . [T]he hypnotic process does more than permit the witness to retrieve real but repressed memories; it actively contributes to the formation of pseudo-memories, to the witness' abiding belief in their veracity, and to the inability of the witness (or anyone else) to distinguish between the two. In these circumstances, . . . the resulting recall of the witness 'is dependent upon, and cannot be disassociated from' the underlying hypnosis. [Citation.]" (31 Cal.3d at p. 53.)

However, rather than involving a problem of unreliability, the case under review presents just the opposite situation. Frio's careful notes more likely prevent rather than encourage the intervention of "condensation, elaboration and invention [which] are common features of ordinary remembering' [citation]." (31 Cal.3d at p. 58.) Instead of changing over time, Frio's memory might remain more constant than if the notes did not exist. Thus, the intrinsic unreliability of hypnosis feared by our Supreme Court in *Shirley* is not a matter for concern.

### 5. *Use of the notes for impeachment of witness who was recorded.*

If Frio is allowed at trial to relate his present recollection of recorded conversations, albeit refreshed, there is no need to allow him to avoid

further the statutory sanction and also use the notes or tapes to impeach any witness he may have recorded.

However, if Frio were to be precluded from giving testimony because of the evidentiary sanction of section 632, the party asserting the sanction should not be permitted to use it as a shield for perjury. The repugnance of an opportunity for a witness who was recorded to lie in this situation is akin to the circumstance of a criminal defendant who testifies at variance with an earlier statement ruled inadmissible because of a violation of *Miranda*.[6]

Until recently, *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], governed the law in California on this point and held statements obtained in violation of *Miranda* could not be used to impeach. Our Supreme Court overruled *Disbrow* in *People* v. *May* (1988) 44 Cal.3d 309, 311 [243 Cal.Rptr. 369, 748 P.2d 307]. Although based primarily upon the "Truth-in-Evidence" component of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), the *May* holding also noted the federal rule enunciated in *Harris* v. *New York* (1971) 401 U.S. 222, 225-226 [28 L.Ed.2d 1, 4-5, 91 S.Ct.643], that "the privilege against self-incrimination cannot be invoked by one who has voluntarily taken the witness stand to testify concerning the subject matter of his [or her] prior statement. [Citation.] As *Harris* explains, 'Every criminal defendant is privileged to testify in his [or her] own defense, or to refuse to do so. *But that privilege cannot be construed to include the right to commit perjury*. [Citations.]' [Citation.] Thus, it seems reasonable to conclude that no privilege, statutory or otherwise, protected defendant from impeachment in this case." (*People* v. *May, supra,* at p. 319; see also, *United States* v. *Havens* (1980) 446 U.S. 620, 627-628 [64 L.Ed.2d 559, 566, 100 S.Ct.1912] [allowing impeachment of a criminal defendant with illegally obtained evidence inadmissible on the government's direct case].)

Similarly, the evidentiary sanction of section 632, subdivision (d), cannot be construed so as to confer upon a testifying witness the right to commit perjury. The truth-finding function of trial, already strained by exclusion of the writings themselves, should not be burdened further by the presentation of evidence through witnesses who may lie with impunity.

6. *Real parties' procedural attacks lacked merit.*

Real parties claim Frio's petition is improperly verified by counsel because it fails to state why Frio did not verify the petition personally. (Code

---

[6] We recognize the trial court may well determine Frio has a present recollection as to some portion of a recorded conversation but not as to others. Our comments with respect to the use of a recorded conversation to impeach a recorded witness's trial testimony are meant to apply to each separate portion of such recorded conversation which was denied admissibility during Frio's direct testimony.

Civ. Proc., § 446.) However, "[w]hen an attorney has verified the pleading as within his own knowledge and also on information and belief but without stating the reason it was not verified by the party, the court may permit the pleading to stand. [Citations.]" (*Perlman, v. Municipal Court* (1979) 99 Cal.App.3d 568, 573 [160 Cal.Rptr. 567].)

Real parties' further assertion that Frio's counsel could not have known all the facts underlying the petition amounts to no more than legal hair splitting. Real parties specifically attack paragraphs of the petition which restate Frio's deposition testimony. Since verifying counsel attended the deposition, the content of Frio's testimony fell within counsel's personal knowledge.

 The object of a verification is to assure good faith in the averments or statements of a party. (*Baker* v. *Hubbard* (1980) 101 Cal.App.3d 226, 233 [161 Cal.Rptr. 551]; *Sheeley* v. *City of Santa Clara* (1963) 215 Cal.App.2d 83, 85 [30 Cal.Rptr. 121].) The absence of any complaint by real parties concerning verifying counsel's good faith renders this contention meritless.

Real parties also argue review of the instant order on appeal after trial provides Frio an adequate remedy at law. While questions of the admissibility of evidence are normally not resolved by way of writ, the alternative of forcing Frio to defend the instant lawsuit and prosecute his cross-complaint improperly shackled by the trial court's improvident exclusionary order, coupled with the expense and delay thereby involved, is so onerous as to render Frio's legal remedy inadequate. Further, in light of the paucity of law in this area and the novelty of the questions presented, we believe this an appropriate case in which to assist the trial court.

CONCLUSION

The criminal proscription of section 632 applies to participant monitoring of confidential communications. However, the evidentiary sanction of section 632, subdivision (d), cannot operate to exclude the independent present recollection of a recording participant because that evidence is not "obtained as a result" of the illegality. Further, use of evidence obtained in violation of section 632 merely to refresh the recollection of the monitoring participant does not render the refreshed testimony inadmissible. However, if the recording party has inadequate recollection of the confidential communication, testimony in the form of past recollection recorded cannot avoid the statutory sanction.

The permissibility of the use of writings obtained in violation of section 632 for impeachment depends upon whether the tape-recorded party has

been successful in asserting the evidentiary sanction. If Frio, the tape recording party, is allowed to state a present independent recollection of a communication, there is no need also to use the tainted evidence to impeach. If Frio's testimony has been excluded under section 632, the tape-recorded party may not also use the evidentiary sanction as a license to lie.

## DISPOSITION

The alternative writ heretofore issued is discharged. Let a peremptory writ of mandate issue directing respondent court to vacate its orders of March 16, 1988, and March 28, 1988, excluding Frio's testimony from introduction at trial and to proceed according to law.

Arabian, J., and Croskey, J., concurred.

On September 23, 1988, the opinion was modified to read as printed above.