Filed 5/15/14  P. v. Rodriguez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL FIGUEREO RODRIGUEZ,<br><br>    Defendant and Appellant. | G048944<br><br>(Super. Ct. No. RIF148601)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Richard Todd Fields, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Rafael Figuereo Rodriguez of aggravated sexual assault of a child under 14 years of age (count 1; Pen. Code, § 269, subd. (a)(4)) and lewd acts upon a child under 14 years of age (count 2; Pen. Code, § 288, subd. (a)). The trial court sentenced defendant to 15 years to life in state prison. Defendant asserts the court erred by admitting evidence of uncharged sexual misconduct. Defendant also claims his trial attorney provided ineffective assistance of counsel in failing to adequately advocate for the admission of certain audio recordings. We affirm the judgment.

FACTS

Defendant (born in 1971) began a romantic relationship with an adult woman (mother) in 2002. Defendant and mother lived together from 2002 to 2009 in several homes in Riverside County. At the beginning of the relationship, mother had two young daughters, including Jane Doe. Jane Doe was born in 1998, making her 13 years old at the time of trial but significantly younger during the time she resided with defendant. During the course of their relationship, defendant and mother had two children of their own, including Jane Doe 2.

Jane Doe's aunt and cousins moved in with the family in 2008. A teenage cousin noticed several disturbing incidents involving defendant and Jane Doe. On one occasion, defendant approached Jane Doe from behind and hugged her. At the time, Jane Doe was leaning against a chair with her rear end sticking out; Jane Doe reacted to the hug with a facial expression indicating she did not like the hug. On another occasion, defendant asked Jane Doe to lie down with him, whereupon Jane Doe placed a pillow on "his private part" and lay down on top of defendant (facing up, with her buttocks on the pillow). When her cousin asked her about defendant, Jane Doe started crying and told her cousin that defendant had touched "her parts" since Jane Doe was six years old. Jane Doe's disclosures ultimately led to mother calling the police.

2

The key evidence at trial consisted of a videotaped police interview of Jane Doe, conducted on February 2, 2009. In this interview, Jane Doe described the first incident when she was six years old: "He took me to his . . . room, and then he laid me on the bed. He took off his shirt, and he . . . took off my clothes, and he kept on touching me." Defendant touched Jane Doe's "boobs" with his hands. Defendant told Jane Doe to keep his actions a secret or "he would leave us all on the street and he would kill [Jane Doe's] mom." On other occasions, defendant "used to take off his pants and take off [Jane Doe's] pants, and . . . bring [Jane Doe] close to him" and place her "on his thing," although Jane Doe did not know if defendant "actually put his thing inside." "[S]ometime[s] . . . some white stuff comes out, and . . . it sounds like it hurts him [be]cause he kind of" made an "ahhh" noise. On one occasion, defendant took his clothes off and climbed into the bathtub with a naked Jane Doe until "white stuff came out." Another time, defendant showed Jane Doe a pornographic movie in which a woman performed oral sex on a man; defendant then put his penis inside Jane Doe's mouth. This incident concluded when defendant "felt like white stuff was going to come out, he told me like get your mouth out of there, and . . . then he went to the bathroom, and then white stuff came out and he started screaming again." Jane Doe described defendant's penis as "pointy and it had some, like a little line, . . . like skin on top of it . . . when he . . . pulled the skin down, sometimes the white stuff came out." Jane Doe stated that defendant had a flag tattoo on his knee. The parties stipulated that defendant had an uncircumcised penis and a flag tattoo above his knee.

Jane Doe testified at trial about defendant's sexual abuse. She recalled some of what occurred, such as an occasion when defendant took her shirt off and touched her in the breast area. She also remembered defendant getting into the bathtub with her and an occasion on which defendant pinned her down and kissed her. Jane Doe also recalled defendant "said if I told anyone, he would kick us out on the street and kill

3

my mom." Jane Doe did not recall many details about defendant's conduct. Jane Doe mentioned she had attended therapy and had tried to forget what had happened.

Over a defense objection, the prosecution also called Jane Doe 2 (Jane Doe's younger sister) to the witness stand. Jane Doe 2 was eight years old at the time of trial. Jane Doe 2 testified that defendant touched her in the vaginal area with his hand. This incident occurred while defendant was inside the bathroom with Jane Doe 2. The door was closed. Defendant told Jane Doe 2 that if she told her mother anything, defendant would kill Jane Doe 2. Jane Doe 2 could not recall how old she was when this incident occurred. Jane Doe 2 did not tell anyone what occurred because she was scared. During her direct examination, Jane Doe 2 denied there were any other times that defendant touched Jane Doe 2. On cross-examination, Jane Doe 2 agreed that defendant touched her "boobies" on the same day.

A video interview of Jane Doe 2's June 2009 interview by police was also played for the jury. After Jane Doe 2 had been allowed to testify over defense counsel's objection, defense counsel advocated for this evidence to be admitted and the prosecutor did not oppose it. Jane Doe 2 did not want to answer questions at the beginning of the interview. Later, Jane Doe 2 drew a picture circling her "pee part" and "butt." Using leading questions, the interviewer extracted responses suggesting defendant touched Jane Doe 2 with his finger on her "pee part" and "cola" (translated as "butt"). This occurred in mother's room when mother was working. Jane Doe 2 was sleeping on the bed. The touching occurred over her clothes. Defendant said he would kill Jane Doe 2 if she told mother. Jane Doe 2 then volunteered that defendant had touched Jane Doe on her "chichis" (translated as "boobs"). Jane Doe 2's mother had told Jane Doe 2 about what happened to Jane Doe. During the second part of the interview, Jane Doe 2 claimed defendant wanted her to touch his private part and threatened to kill Jane Doe 2, but she did not touch it. Jane Doe 2 added that defendant touched her breasts. Jane Doe 2 then said defendant licked her tongue with his tongue. Finally, Jane Doe 2 claimed defendant

4

licked her "pee part," but then said the tongue was touching her clothes (not the "pee part").  This happened three times in her sister's room.

In addition to Jane Doe's hazy memory at trial, defense counsel had several other arrows in her quiver.  For one, defendant testified, unequivocally denying any wrongdoing or any sexual interest in children.  Defendant also testified to a motive for mother to gin up sexual abuse allegations against defendant — defendant's discovery of an alleged plot between mother and several of her relatives to kill defendant for his life insurance proceeds.  Moreover, an expert witness opined that defendant did not have *any* of the characteristics typically present in child molesters.  Finally, the court took judicial notice (and instructed the jury to accept as true) that defendant was acquitted in a previous trial of the charge that he had committed a lewd act upon Jane Doe 2.[1]  At the previous trial, Jane Doe 2 denied that defendant touched her.

DISCUSSION

The jury found defendant guilty beyond a reasonable doubt of both charged counts.  Defendant does not contest the sufficiency of the evidence supporting the convictions.  Instead, defendant advocates for reversal on two grounds:  (1) the court erred by admitting evidence of incidents of uncharged sexual misconduct involving Jane Doe 2 and (2) trial counsel was ineffective in failing to argue for the use of certain recordings (discussed in detail below), both as impeachment evidence and in defendant's case-in-chief.  We reject each of defendant's assertions.

---

[1]	The jury hung as to the Jane Doe counts at the first trial, splitting 10 to two in favor of acquittal on count 1 and six to six on count 2.  The jury in this case was not made aware of this fact.

5

*The Court was Entitled to Admit Evidence of Defendant's Uncharged Sexual Misconduct*

Defendant first argues the court erred by allowing the introduction of Jane Doe 2's testimony as evidence of the truth of the allegations (concerning Jane Doe) against him in this case, thereby infringing defendant's constitutional right to a fair trial. The court denied defendant's motion in limine to exclude Jane Doe 2's testimony. Explicitly conducting an Evidence Code section 352[2] analysis, the court characterized the evidence as "certainly probative." The court deemed the Jane Doe 2 evidence to be "less inflammatory" than the charged offenses and concluded that the evidence would not confuse the jury, "require an undue consumption of time, or be unduly prejudicial."

Section 1108 "permits evidence that the defendant committed other sexual offenses to prove his propensity to commit the charged sexual offenses." (*People v. Cottone* (2013) 57 Cal.4th 269, 281.) "The general public policy on character or propensity evidence is that it is *not* admissible to prove conduct on a given occasion. [Citations.] Section 1108 creates a narrow exception to this rule based on the recognition that '"[t]he propensity to commit sexual offenses is not a common attribute among the general public."'" (*Id.* at p. 285.) Section 1108 "authorizes the admission of evidence not just of convictions but of a defendant's 'commission' of prior sex crimes." (*People v. Wilson* (2008) 44 Cal.4th 758, 798.)

The admissibility of evidence of other sexual offenses is limited by section 352. (§ 1108, subd. (a) ["if the evidence is not inadmissible pursuant to Section 352"]; see § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and

---

[2] All statutory references are to the Evidence Code unless otherwise stated.

possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

We review the court's decision for an abuse of discretion. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) According to defendant, the court abused its discretion primarily because the truth of Jane Doe 2's testimony was too uncertain to justify its admission. There are inconsistencies between Jane Doe 2's testimony and her 2009 police interview. At the previous trial, Jane Doe 2 denied that defendant had improperly touched her. Defendant was acquitted by an earlier jury of the conduct testified to by Jane Doe 2 in the instant trial. (But see *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233 ["evidence of a prior act may be introduced as propensity evidence even if the defendant was acquitted of criminal charges based upon that act"].) Jane Doe 2 was only eight years old at the time of the instant trial in 2012, meaning she was, at most, five years old at the time of the alleged lewd conduct by defendant. Jane Doe 2's testimony did not include the sort of details that might buttress its credibility. Jane Doe 2's allegations were first reported after defendant's arrest, precluding an inference that her complaint was made independently of her knowledge of Jane Doe's allegations. (Cf. *People v. Balcom* (1994) 7 Cal.4th 414, 427 [recognizing increased probative value of victim's report of uncharged sexual misconduct when victim did not have knowledge of charged offenses].)

We acknowledge the weaknesses of the Jane Doe 2 evidence. But, if true, the allegation that defendant molested Jane Doe 2 is probative. If defendant in fact touched his own biological daughter on her vagina with lewd intent when she was a

7

preschooler, it is certainly more likely defendant also sexually abused Jane Doe when she was between the ages of six and 10 years old. The uncharged offense had several important similarities to the charged offense. The incidents both involved very young girls living in defendant's household during the same general period of time. Both girls testified about defendant's use of threats to obtain their silence. Thus, Jane Doe 2's testimony had some probative value.

On the other side of the section 352 ledger, several factors support the trial court's exercise of discretion in concluding that the probative value of Jane Doe 2's testimony was not substantially outweighed by an undue consumption of time, undue prejudice, confusion of the issues, or misleading of the jury. The admission of Jane Doe 2's testimony did not significantly add to the difficulties of the defense, because it involved one discrete event upon which defendant had already been acquitted in a prior trial. This Jane Doe 2 evidence did not in fact occupy a substantial portion of the trial (about 25 pages of testimony in the reporter's transcript, plus about 36 pages of the police interview in the clerk's transcript).

The Jane Doe 2 evidence was certainly inflammatory given the young age of the victim and the threats made by defendant to his own daughter. But the Jane Doe 2 evidence was less inflammatory than the charged incidents because it was limited to manual touching, as opposed to defendant's use of his penis in the Jane Doe incidents. The Jane Doe 2 testimony was therefore unlikely to provoke an emotional response by the jury (beyond that evoked by direct evidence of the incidents involving Jane Doe). (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1338 ["evidence of past offenses was not inflammatory, and there was no risk of confusion because the prior acts of domestic violence were less serious than the charged act"].)

The jury was informed (through Jane Doe 2's testimony) that she had testified in a different manner at the first trial. And, as required, the court took judicial

8

notice of defendant's acquittal of the prior sexual misconduct involving Jane Doe 2. (See *People v. Mullens* (2004) 119 Cal.App.4th 648, 659-669 [court was within its discretion by admitting evidence of uncharged offenses but erred by refusing to allow evidence that defendant was acquitted of committing one of the offenses].) In theory, this cuts both ways. On one hand, it makes it less likely the jury would believe Jane Doe 2's allegations. On the other hand, if the jury did believe Jane Doe 2, it might be tempted to punish defendant for his lewd acts with Jane Doe 2 in this case. The theoretical concern that the jury might punish defendant for the Jane Doe 2 incident is less likely in this case, however, given the stronger evidence for the Jane Doe allegations.

In sum, the court did not abuse its discretion. Even if the probative value of section 1108 evidence is "slight," the evidence is still admissible if there is not "any significant 'prejudicial' effect, as that word is used in . . . section 352." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 733.)[3]

*Counsel's Performance Did Not Fall Below the Standard of Professional Competency*

Defendant's second contention is that his trial counsel's failure to seek admission of certain recordings as impeachment evidence prejudiced defendant and constituted ineffective assistance of counsel. "A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of

_____

[3] The California Supreme Court made clear in *People v. Falsetta*, *supra*, 21 Cal.4th 903, that section 1108 is constitutional. (See *People v. Loy* (2011) 52 Cal.4th 46, 60-61 [declining to reconsider the issue]; *People v. Wilson*, *supra*, 44 Cal.4th at p. 797 [same].) Thus, to the extent defendant is claiming that his constitutional right to a fair trial was violated even if the court was within its discretion in admitting the Jane Doe 2 evidence, we reject his argument.

9

reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Some additional background is necessary to place the recordings (of which we have transcripts in the appellate record) in context.  First, defendant's testimony:  At some point in his relationship with mother he had purchased two life insurance policies naming mother as the beneficiary.  In late 2008, defendant's relationship with mother began to suffer after mother's sister (aunt) moved into the house.  Defendant noticed "a certain mystery between them.  A lot of talking in low tones behind my back.  And I would ask [mother], and she never gave me a concrete answer.  And so that began to bother me."  Defendant heard mother and aunt "talking about something related to some kind of witchcraft, some plan to harm me, to kill me, with the end and the goal of getting" the proceeds from the two insurance policies.  Defendant confronted mother about her plot to kill him in late January 2009.  Mother told defendant she did not know what he was talking about.  Defendant and mother had an argument.  Defendant told mother he was going to leave her; when he returned to the house 30 minutes later, the police were there to question him.

10

Conversely, mother testified in rebuttal that she learned about the sexual abuse of Jane Doe from aunt. At the time, she "couldn't believe it. How could I believe the father of two of my daughters, the man that I shared several years of my life [with], and that I had deposited all my trust with my daughters?" Mother thought about whether she would notify the police. She added, "I wanted to kill him." She explained she wanted to kill defendant "[b]ecause he was abusing my daughters. I never thought that I was going to kill him, or kill him with a knife. It was just based on instinct." Mother confirmed she practiced the Santeria religion, but denied she had specifically prayed for the death of defendant. Mother admitted telling her relatives that she wanted defendant to die. But this had to do with the molestation allegations. Mother and defendant argued about defendant's actions before she called the police. Mother did not recall defendant confronting her about wanting to kill him. She delayed reporting the incident to police because she was in shock.

On cross-examination, mother clarified that she did not recall what she asked or prayed for with regard to the death of defendant. Defense counsel confronted mother with her testimony from the prior trial, which was that she asked for the death of defendant. She agreed she had asked all the saints and God. Mother at first did not recall her testimony from the prior trial that she asked a particular saint, but then agreed she asked the saint she believed in for defendant's death. Mother denied trying to put a "spell" on defendant with the help of her brother. Mother did not recall defendant asking her why she wanted to kill him at the argument prior to the police being called. But after reviewing her testimony from the prior trial, she agreed that "possibly during the argument that we had, he could have said that." Mother agreed that defendant had two life insurance policies of which mother was the beneficiary.

During her cross-examination, aunt denied being involved in a plot to kill defendant. Counsel noted during a colloquy with the court that she had nothing with

11

which to impeach aunt (unlike mother, who was impeached with her testimony from the prior trial).

In a pretrial motion in limine, the prosecutor sought to exclude from evidence any mention of mother's Santeria religion as well as certain recordings defendant surreptitiously made of mother. Defendant wished to introduce evidence to establish that mother was using witchcraft to kill defendant for his insurance money. Defense counsel stated that she did "not seek to admit the actual recording, rather, just [defendant's] knowledge of and response to such statements." In its pretrial ruling, the court prospectively allowed defendant to show the charges were made after defendant supposedly discovered a plot to kill him. The court explicitly ruled that the recordings were inadmissible under Penal Code section 632, subdivision (d), without any argument to the contrary from counsel.[4]

In his initial argument on appeal, defendant does not contend the court's ruling was in error with regard to the defense's case-in-chief. Instead, defendant claims trial counsel should have tried to use the recordings as impeachment evidence against mother and aunt. As noted above, defense counsel asked mother and aunt questions concerning the supposed plot to kill defendant and impeached mother with her testimony from the prior trial, but did not try to introduce the audio recordings as impeachment evidence. Defendant posits that evidence inadmissible under Penal Code section 632 "can be used to impeach inconsistent testimony by those seeking to exclude the evidence." (*People v. Crow* (1994) 28 Cal.App.4th 440, 452; see also *Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1497.)

---

[4] Penal Code section 632, subdivision (d), states that "[e]xcept as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding."

Our review of the transcripts of the (undated) audio recordings contained in the record[5] suggests the surreptitious recordings were vague and unclear, and did not include significantly more information beyond that communicated to the jury as part of the cross-examination of mother. Two of the recordings feature only mundane conversations without any conceivable pertinence to the case. The other two recordings are in large measure incomprehensible. Only a few snippets qualify as arguably relevant. The first recording included someone (purportedly mother) talking to other individuals (purportedly mother's siblings) about starting some process at midnight in which "he" needed to "be deeply asleep." The second recording includes the following colorful comment (purportedly by mother): "He's gonna get the shit scared out of him. He's going to regret the day he was born. I am going to do some fucking witch craft on him, fucking dog."

Defendant has failed to establish either deficient performance by his trial counsel or resulting prejudice. As shown in the preceding paragraphs, defendant was in fact allowed to pursue his defense that mother, motivated by a desire to deflect attention from her own wrongful plot to kill defendant, commanded her daughters to falsely claim defendant had sexually abused them. Defendant was even allowed over the objection of the prosecutor to link mother's religious beliefs and practices to her alleged plot. The jury was presented with a disputed question of cause and effect: Was mother's desire for defendant's death the result of her finding out about the sexual abuse of Jane Doe or a motive for her to invent false accusations against defendant once he found out about the supposed plot? On the record before us, the contents of the recordings simply do not add significantly to the impeachment of mother or aunt. It is unclear whether any of the statements in the recordings are inconsistent with the testimony of mother or aunt. Thus, it cannot be said that trial counsel was deficient or that prejudice occurred as a result of

---

[5] It appears these transcripts were admitted as exhibits in the first trial.

13

such deficiency. In his reply brief, defendant suggests "it is not clear that the record on appeal contains the entirety of the evidence relied on by trial counsel." Of course, assertions that evidence outside the record support a claim of ineffective assistance of counsel are better dealt with in a habeas proceeding. It is not the role of appellate courts to speculate as to evidence that might or might not exist in evaluating a claim of ineffective assistance of counsel.

*Ineffective Assistance of Counsel Pertaining to Penal Code Section 632*

In supplemental briefing, defendant claims his trial attorney also should have argued that the audiotapes were admissible in his case-in-chief (not just as impeachment evidence), notwithstanding Penal Code section 632, subdivision (d).[6] This supplemental briefing was triggered by a December 2013 published opinion interpreting the applicability of Penal Code section 632, subdivision (d) in criminal cases in light of the "Right to Truth-in-Evidence" provision of the California Constitution (Cal. Const., art. I, § 28, subd. (f), par. (2) [stating in part that "relevant evidence shall not be excluded in any criminal proceeding"]). However, between defendant's supplemental opening brief and supplemental reply brief, the case was ordered depublished by our Supreme

---

[6] Defendant also argues in his supplemental briefing that the court erred by excluding this evidence pursuant to Penal Code section 632, subdivision (d), without regard to the ineffective assistance of counsel framework. But this claim was forfeited, as defendant failed to seek admission of the recordings or argue the point below. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 ["Where, as here, a proponent of evidence does not assert a particular ground of admissibility below, he or she is precluded from arguing on appeal that the evidence was admissible under a particular theory"]; Evid. Code, § 354.) Indeed, defense counsel explicitly represented to the court in writing that she would "not seek to admit the actual recordings, rather, just [defendant's] knowledge of, and response to, such statements." Thus, just as the claim that the recordings should have been introduced as impeachment evidence could only be raised via an ineffective assistance claim, so too with the admissibility of the recordings in defendant's case-in-chief.

14

Court.  (See *People v. Algire* (Dec. 17, 2013) B244557, opn. ordered nonpub. Mar. 19, 2014.)

Defendant nonetheless maintains that trial counsel provided ineffective assistance by not arguing that the Right to Truth-in-Evidence provision nullified Penal Code section 632, subdivision (d) in criminal cases.  But for the same reasons stated in the previous section pertaining to the use of the audio recordings as impeachment evidence, defendant cannot demonstrate deficient performance or prejudice in this direct appeal.  The shortcomings of the recordings (e.g., vague, sometimes nonsensical statements) meant that counsel could have had viable reasons for wishing to rely on defendant's testimony and the cross-examination of mother, rather than trying to introduce recordings that were not particularly probative of anything.  The recordings were arguably relevant to the defense, but defense counsel accomplished more or less the same thing through cross-examination of mother.  We fail to see how defendant was prejudiced by his counsel's decision not to pursue admission of the recordings.

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

MOORE, ACTING P. J.

THOMPSON, J.

15